# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION: J |
| | | |
| These Pleadings apply to: | * | |
| *All Cases in Pleading Bundle* | * | |
| *Section III.B(3)* | * | |
| | * | |
| | * | JUDGE BARBIER |
| | * | |
| | * | MAGISTRATE |
| | * | SHUSHAN |
| *   *   *   *   *   *   *   *   *   *   * | * | |

## MASTER COMPLAINT IN ACCORDANCE WITH
## PTO NO. 11 [CASE MANAGEMENT ORDER NO. 1]
## SECTION III.B(3) ["B3 BUNDLE"]

### <u>Complaint in Admiralty</u>

### <u>Rule 9(h)</u>

1

## I.    INTRODUCTION

On April 20, 2010, an explosion on board the oil vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States.   The explosion resulted in an oil spill of unprecedented proportions and an oil slick that grew exponentially, depleting and destroying marine and coastal environments and estuarine areas in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas and Florida (the "Gulf States").  In an ill-conceived effort to contain and to clean up the spill, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water.  Vast quantities of oil and debris were burned at the surface of the Gulf or skimmed from the water.  Beaches, marshes and wetlands fouled by oil and chemicals have been the focus of a variety of remedial efforts to remove the hazardous materials from these fragile areas.   Although the leaking well is now capped, the disastrous effects of the spill on the public health, the environment and the income, businesses and property of the residents, and property owners of the region are widespread and will likely remain so for decades.

Hundreds of individual and class actions were filed in state and federal courts on behalf of the thousands of victims of the spill.  By order entered on August 10, 2010, the Multi-district Litigation Panel (the "MDL Panel") transferred all actions then pending to this Court.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" In the Gulf of Mexico, on April 20, 2010,* MDL No. 2179, --- F. Supp. 2d ----, 2010 WL 3166434 (JPML, August 10, 2010) (the "Transfer Order").   On October 19, 2010, this Court entered its Case Management Order No. 1 (hereinafter "CMO No. 1"), wherein it directed

the filing of Master Complaints on behalf of the Plaintiffs.  This Master Complaint is filed pursuant to CMO No. 1, Paragraph III.B(3), on behalf of those plaintiffs seeking damages for physical injuries, costs of future medical screening and monitoring, the implementation of a medical screening and monitoring program and/or property damage resulting from clean-up efforts after the explosion at issue, and who have filed their claims in this Court or whose claims have been transferred to this Court pursuant to the Transfer Order.

Accordingly, pursuant to CMO No. 1, Paragraph III.B(3), Plaintiffs, by their undersigned counsel and other counsel identified herein, for themselves and all others similarly situated, submit this Master Complaint for actual, compensatory and punitive damages and other relief arising from the oil spill by the *Deepwater Horizon* oil vessel in the Gulf of Mexico on April 20, 2010, and state as follows:

1.      On April 20, 2010, at approximately 9:45 p.m. CST, a well blowout caused explosions on the *Deepwater Horizon,* an oil vessel in the Gulf of Mexico, igniting a raging, gas-fueled fire on the vessel.  After burning for two days, the vessel sank to the ocean floor.

2.      As the *Deepwater Horizon* tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end, as well as through two breaks along its length.  An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

3.      Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines, where oil made landfall on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.  Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

4.      In the wake of the disaster, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.  This disaster response plan had three primary components: subsea response; offshore containment; and shoreline protection.

5.      BP's response to its self-created disaster included the use of chemical dispersants manufactured by Nalco that were intended to break down the oil into finely dispersed droplets.  Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

6.      Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the decks of boats, sprayed from smaller vessels

onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

7.     To date, BP and its contractors have used more than 1.8 million gallons of Nalco's chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

8.     Many Plaintiffs are assisting in the effort to prevent oil slicks from reaching the shore, or cleaning oil spill residue from the beaches, marshes and estuaries by participating in the relief effort orchestrated by BP.  As part of this effort, Plaintiffs come into contact with crude oil, chemical dispersants and oil/chemical mixtures.  Even more disturbing, BP's aerial spray planes have negligently and/or intentionally sprayed chemical dispersants on the water despite the presence of boats and their crews in the vicinity of the spraying.

9.     Exposure to chemicals in crude oil and chemical dispersants can cause a wide range of health problems.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.  Dispersant chemicals can affect many of the same organs.  These include:  respiratory system, nervous system (including the brain), liver, reproductive/urogenital system, kidneys, endocrine system, circulatory system, gastrointestinal system, immune system, sensory systems, musculoskeletal system, hematopoietic system (blood forming), skin and integumentary system and disruption of normal metabolism.

10.     Damage to these systems can cause a wide range of diseases and conditions.  Some of these diseases and conditions may be immediately evident, and others can appear months or years later.  The chemicals can impair normal growth and development through a variety of mechanisms, including endocrine disruption and direct

fetal damage.  They can cause mutations that may lead to cancer and multi-generational birth defects.  Some of the chemicals are known carcinogens, such as benzene.

11.     Many of the chemicals in crude oil and the dispersants target the same organs in the human body, and this increases the risk and may also increase the severity of harm.  In addition, the dispersants currently used can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs.

12.     Many Plaintiffs have already experienced headaches, nausea, vomiting, dizziness, elevated blood pressure, eye and respiratory irritation, and rashes and/or chemical burns caused by coming into contact with oil and/or chemical dispersants. Moreover, the odors emanating from the oil and/or the dispersants are foul and the fumes are harmful.

13.     This Master Complaint is submitted pursuant to this Court's CMO No. 1, as: 1) an administrative device to serve the functions of efficiency and economy; and 2) to present certain common claims and common questions of fact and law for appropriate action by this Court in the context of this multidistrict proceeding.

14.     This Master Complaint does not include all claims asserted in all of the actions that have been transferred to this Court pursuant to the Transfer Order, nor is it intended to consolidate for any purposes the separate claims of the Plaintiffs.  Those claims are set forth in the individual and class actions filed by each of the respective Plaintiffs.

15.     This Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in the individual and class actions arising out of the Oil Spill, nor by it do the Plaintiffs relinquish the right to add or assert, or seek leave to add or

assert, additional claims and parties defendant depending on further information learned through discovery or investigation.

16.     This Master Complaint makes allegations of common issues of law and/or fact relating to the liability of Defendants, and places Defendants on notice that Plaintiffs may seek certification of one or more classes and/or subclasses, as appropriate, for the class-wide determination of the common issues of law and/or fact relating to the liability of Defendants. To such classes and/or subclasses actual, compensatory and punitive damages should be awarded to Plaintiffs for the injuries they have sustained as a result of Defendants' knowledge, conduct, acts and omissions as set forth herein.  Plaintiffs seek to maintain this action as a class action and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4); (b)(1)(B); (b)(3); (c)(4); and (c)(5).

17.     Further, additional parties will likely join as plaintiffs in this action after the filing of this Master Complaint, and those potential plaintiffs will have the opportunity to join this action by completing an online form dedicated to that purpose.

18.     The factual allegations pleaded in the Master Complaint for the B1 Pleading Bundle are incorporated into and made a part of this Master Complaint.  In addition, this Master Complaint incorporates the following Claim for Relief in the Master Complaint for the B1 Pleading Bundle: Count I ("A" through "E").

19.     This Master Complaint, and Cross-Claim, and Third-Party Complaint makes allegations of, and places Defendants on notice that Plaintiffs may seek, certification of one or more classes and/or subclasses, as appropriate, for the classwide determination of common issues of law and/or fact relating to the liability of Defendants

to the members of such classes and/or subclasses for actual, compensatory, and punitive damages for the economic harm and damage to business and property Plaintiffs have incurred as a result of Defendants' knowledge, conduct, acts and omissions as set forth herein. Plaintiffs will seek to maintain this action as a class action, and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4); (b)(1)(B); (b)(2); (b)(3); (c)(4); and (c)(5). Prior to any class certification motion, in sufficient time to place Defendants on fair notice and to enable appropriate discovery and briefing, with such scheduling subject to Court approval, Plaintiffs will identify those persons who will serve as proposed representatives for the class and/or subclasses sought to be certified and, if necessary, add or join them as parties hereto.

20. Further, additional parties will likely join as plaintiffs in this action after the filing of this Master Complaint, Cross-Claim, and Third-Party Complaint, and those plaintiffs will have the opportunity to adopt these allegations and join this action by completing a form dedicated to that purpose to be approved by the Court.

## II. PARTIES

### A. Plaintiffs

21. Plaintiffs are citizens of Florida, Alabama, Mississippi, Louisiana, Texas and other states, who have been exposed to harmful chemicals, odors and emissions during the clean-up following the *Deepwater Horizon* explosion. They fall into five basic categories:

> (a) Boat captains and crew involved in the Vessels of Opportunity program ("VoO program") (referred to in this Master Complaint as VoO Plaintiffs).

8

(b)     Workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants (referred to in this Master Complaint as Decontamination Plaintiffs).

(c)     Vessel captains and crew who were not involved in the VoO program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities (referred to in this Master Complaint as Vessel Plaintiffs).

(d)     Clean-up workers and beach personnel who were involved in clean-up activities along shorelines and intercoastal and intertidal zones (referred to in this Master Complaint as Onshore Plaintiffs).

(e)     Residents who live and work in close proximity to coastal waters (referred to in this Master Complaint as Resident Plaintiffs).

22.     Plaintiffs all worked to clean up oil and chemicals caused by BP's *Deepwater Horizon* disaster, either on the water or on the beaches and other onshore areas, or were otherwise exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill.

23.     Certain Plaintiffs own personal and real property that was damaged by coming into contact with crude oil, dispersants, or mixtures of oil and harmful chemicals caused by the Oil Spill.

**B.      Defendants**

***The BP Defendants***

24.     Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP

9

Exploration was a holder of a lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.

25.     The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it is referred to as the MMS throughout this Master Complaint.

26.     BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.  This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

27.     Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  BP America Production was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel.  This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

28.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009.  BP

p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United States.  Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

29.     BP p.l.c. has submitted to this Court's jurisdiction by responding to Plaintiffs' discovery requests.

30.     BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP p.l.c.'s contacts with the U.S. are as follows:  (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

31.     This Court has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and with the U.S. more generally), and has been served with summonses in individual complaints that allege similar causes of action to those alleged in this Master Complaint.

32.     Alternatively, this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. has been served with summonses in individual complaints that allege similar causes of action to those alleged in this Master Complaint.

33.     This Court also has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission outside of Louisiana, and BP, p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP, p.l.c. after the blowout in attempting to contain the Oil Spill. BP p.l.c. has been served with summonses in individual complaints that allege similar causes of action to those alleged in this Master Complaint.

34.     In addition, this Court also has personal jurisdiction over BP p.l.c. under agency and alter ego principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana.  BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c.  In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration,

BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

35.     Moreover, BP p.l.c. undertook the duty for pay and/or gratuitously to clean up the Oil Spill and as a result is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

36.     BP Exploration, BP America and BP p.l.c. are generally referred to collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

### Other "Responsible Parties"

37.     Defendant Anadarko Petroleum Corporation Co. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko is registered to do and does business in the State of Louisiana.  Anadarko is an oil and gas exploration and production company.

38.     Defendant Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is registered to do and does business in the State of Louisiana.  Anadarko E&P is an oil and gas exploration and production company.

39.     Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas.  MOEX Offshore does business in

the State of Louisiana and/or in state and/or federal waters off the coast of Louisiana. MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation.

40.     Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas.  MOEX USA is the parent company of MOEX Offshore. According to Texas Secretary of State records, the stated business purposes of MOEX USA include the direct or indirect engagement in the business of "exploration, development and production of hydrocarbons and any business related to the exploration, development and production of hydrocarbons," and the acquisition of "Hydrocarbon Interests by purchase, lease, farm-in, license, exchange or other means or methods. . . ."

41.     Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan.  As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates:  MitEnergy Upstream LLC, MOEX USA Corporation, MOEX Offshore 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC.  Each of these subsidiaries of MOECO share the same Houston, Texas, address.

42.     MOECO states on its website as follows:  "MOEX USA Corporation, a wholly owned subsidiary of MOECO, has a 10% interest in ultra-deepwater Mississippi Canyon 252, located in the U.S. Gulf of Mexico, through its 100% owned subsidiary, MOEX Offshore 2007 LLC."

43.     In a press release dated July 24, 2007, MOECO announced that it had

14

entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. … on the 29th of June 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico … which is being actively pursued by BP." According to the release, "MOECO decided to participate in the project based upon its evaluation of the prospect which BP's [Gulf of Mexico] technical team has conducted extensive study and research [sic]." The release also indicates that "Japan Oil, Gas and Metals National Corporation . . . has agreed to provide equity capital finance for MOECO's share of the drilling costs payable under the Acquisition and Participation Agreement. An exploratory well is scheduled to be drilled from September 2007 by BP as the operator and as a result of the participation and such well interests in the project will be BP (75%), MOECO (15%) and other (10%)." The release concludes with MOECO indicating that its participation in the project "provides an excellent opportunity to further expand its business in the U.S." *See* www.MOECO.co.jp/english/topics/070724.html.

44.     Defendants MOEX Offshore, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

45.     While BP was the sole lease operator of the Deepwater Horizon, Anadarko, Anadarko E&P, and MOEX were considered non-operational leaseholders.

46.     As of October 1, 2009, Anadarko owned a 2.5% stake in the Macondo prospect lease, Anadarko E&P owned a 22.5% stake, and MOEX owned a 10% stake. According to MMS records, however, effective April 1, 2010, record title interest in the Macondo prospect was held by Anadarko (25%), BP (65%), and MOEX (10%).

47.     As joint holders of a leasehold interest in an oil or gas lease on land

beneath navigable waters, Defendants Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants BP pursuant to the Oil Pollution Act.

### The Transocean Defendants

48.     Defendant Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains U. S. offices in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district.  According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

49.     Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district.  Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

50.     Defendant Transocean Deepwater, Inc. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

51.     Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary

of Transocean Offshore.  Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.  More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico.  On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the explosion aboard the Deepwater Horizon.

52.     Defendant Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

53.     Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it.  At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.   Transocean also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.

**The Dispersant Defendants**

54.     Defendant Marine Spill Response Corporation ("MSRC") is a Tennessee non-profit corporation with its principal place of business in Herndon, Virginia, and at all pertinent times was doing business in the State of Louisiana.  MSRC participated in the post-explosion Oil Spill remediation and response efforts.

55.     Defendant Airborne Support, Inc. ("ASI") is a Florida corporation with its principal place of business in Houma, Louisiana, and at all pertinent times was doing business in the State of Louisiana. ASI participated in the post-explosion Oil Spill remediation and response efforts.

56.     Defendant Airborne Support International, Inc. ("ASI International") is a Louisiana corporation with its principal place of business in Houma, Louisiana, and at all pertinent times was doing business in the State of Louisiana. ASI International participated in the post-explosion Oil Spill remediation and response efforts.

57.     Defendant Lynden, Inc. is a Washington Corporation with its principal place of business in Seattle, Washington, which at all pertinent times was doing business in the State of Louisiana by virtue of its 100 percent ownership interest in Lynden Air Cargo, LLC, an Alaska limited liability company with is principal place of business in Seattle, Washington, which at all pertinent times was doing business in the State of Louisiana (collectively, "Lynden"). Lynden participated in the post-explosion Oil Spill remediation and response efforts.

58.     Defendant Dynamic Aviation Group, Inc., ("Dynamic") is a Virginia corporation with its principal place of business in Bridgewater, Virginia and at all

pertinent times was doing business in the State of Louisiana.  Dynamic participated in the post-explosion Oil Spill remediation and response efforts.

59.    Defendant International Air Response, Inc. ("IAR") is an Arizona corporation with its principal place of business in Coolidge, Arizona and at all pertinent times was doing business in the State of Louisiana.  IAR participated in the post-explosion Oil Spill remediation and response efforts.

60.    Defendant Lane Aviation ("Lane") is a Texas corporation with its principal place of business in Rosenberg, Texas and at all pertinent times was doing business in the State of Louisiana. ASI participated in the post-explosion Oil Spill remediation and response efforts.

61.    Defendant National Response Corporation ("NRC") is a Delaware corporation with its principal place of business in Great River, New York, and at all pertinent times was doing business in the State of Louisiana (together with SEACOR Holding, Inc., a Delaware corporation with its principal place of business in Delaware, of which NRC is a wholly-owned subsidiary). NRC participated in the post-explosion Oil Spill remediation and response efforts.

62.    Defendant O'Brien Response Management, Inc. ("O'Brien") is a Louisiana corporation with its principal place of business, upon information and belief, in the Parish of St. Tammany, State of Louisiana. O'Brien participated in the post-explosion Oil Spill remediation and response efforts.

63.    Defendant Tiger Safety, LLC ("Tiger") is a Louisiana limited liability company with its principal place of business, upon information and belief, in the Parish

of East Baton Rouge, State of Louisiana.  Tiger participated in the post-explosion Oil Spill remediation and response efforts.

64.     Defendant DRC Emergency Services, LLC ("DRC") is an Alabama limited liability company that at all pertinent times was doing business in the State of Louisiana. DRC participated in the post-explosion Oil Spill remediation and response efforts.

65.     Defendants MSRC, NRC, IAR, ASI, ASI International, Lane, Lynden, Dynamic, O'Brien, Tiger and DRC are collectively referred to as the "Dispersant Defendants."

### Nalco Defendant

66.     Defendant Nalco Company is a Delaware corporation, wholly owned by Nalco Holdings LLC, a Delaware limited liability company. Nalco Holdings LLC is wholly owned by Nalco Finance Holdings LLC, a Delaware limited liability company. Nalco Finance Holdings LLC is wholly owned by Nalco Holding Company, a Delaware corporation.  Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company are collectively referred to as "Nalco."  At all pertinent times, Nalco was doing business in the State of Louisiana.

67.     Nalco is the manufacturer of the chemical dispersants purchased by BP for use in connection with clean-up efforts in response to the Oil Spill.

68.     Defendant Corporations A-Z are corporations or companies whose identities and/or proper corporate names are currently unknown.  All allegations and claims asserted herein against Defendants are incorporated by reference against Defendants Corporations A-Z.

69.    Defendants John and Jane Does A-Z are persons or entities whose identities and/or proper corporate names are currently unknown.  All allegations and claims asserted herein against Defendants are incorporated by reference against John and Jane Does A - Z.

70.    Each of these Defendants is jointly, severally, and/or solidarily liable under various principles of federal, maritime and/or applicable State tort law.

### III.    JURISDICTION AND VENUE

71.    Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction."

72.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1333, which extend exclusive Federal jurisdiction to the Outer Continental Shelf.

73.    This Court also has jurisdiction over this action pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

74.    This Court also has jurisdiction over this action pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

75.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

76.    The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

21

77.    Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the Transfer Order.  Venue is also appropriate in this District pursuant to the OPA, 33 U.S.C. § 2717 (b), because the discharge, injuries and damages occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    The *Deepwater Horizon* Catastrophe

78.    The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  It was leased to BP through September 2013.  It was one of the largest vessels of its kind.

79.    BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

80.    On April 20, 2010, and as described in greater detail in the Master Complaint for Pleading Bundle B1, workers on the *Deepwater Horizon* oil vessel lost control of the Macondo well just after the final cementing work was completed.  During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

81.    The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel.  The fire burned for two days, and the vessel began to list progressively more until it finally sank on April 22, 2010.

82.    The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally

22

tearing away from it completely.  The riser, bent into a crooked shape under water, extended from the well to 1,500 feet above the sea bed and then buckled back down.  Oil flowed out from the open end of the riser and from at least two places along its length.

83.     While crude oil was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.

84.     After the explosions, BP attempted to downplay and conceal the severity of the Spill.  Its initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its measured leakage amount of 50,000 barrels per day.  Moreover, following the Oil Spill, BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Oil Spill.

85.     On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had actually revealed that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

86.     The flow of oil continued unabated, and the ever-expanding oil slick made landfall on April 30, 2010, and will continue to affect greater areas of the Gulf coastline as it is driven landward by currents and winds.

87.     After the Oil Spill, an oil slick with a range of thousands of miles had formed and could be seen from outer space.  Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico.  The Oil Spill caused this slick and these plumes to form.  Oil washed and is washing ashore in the Gulf of Mexico, posing significant environmental and public health risks.

88.     As the oil made landfall along the Gulf Coast, it infiltrated and will continue to infiltrate the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, Texas and Florida, requiring clean up.

89.     For 86 days, oil spewed into the Gulf of Mexico from the damaged well, dumping an estimated 200 million gallons of crude oil into sensitive ecosystems.

90.     On July 15, 2010, almost four months after the explosion and fire on the *Deepwater Horizon*, BP finally capped the well.

91.     The OPA imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

92.     The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

93.     After the Oil Spill, the Coast Guard formally and/or informally designated Defendants BP Exploration, Anadarko LP, Anadarko, MOEX and Transocean Holdings as "responsible parties" under the OPA.

### B.     The Response Effort and the Vessels of Opportunity

94.     After the disaster, BP began implementing a disaster response plan to prevent oil from escaping the blown out well, to manually contain the oil, and to disperse oil in the water using Nalco's chemical dispersants.

95.     As part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to

skim oil from the surface of the water; the use of vessels to conduct *in situ* burning of oil that reached the surface of the water; and the use of Vessels of Opportunity ("VoO").

96.     The VoO program is touted by BP as a key component to BP's response to the disaster.  BP used at least 2,000 commercial and charter fishing vessels and other boats from communities along the shoreline to tow and deploy booms – floating barriers intended to contain, deflect, or hold back oil floating on the water's surface.  Other VoOs worked with absorbent booms used to soak up some of the millions of gallons of oil coming to the surface of the Gulf.  Still other VoOs supported *in situ* burning efforts.  Some VoOs conducted skimming operations to skim oil off the surface.  Other VoOs recover light oil and tar balls.

97.     Plaintiff vessel owners who participated in the VoO program entered into Master Vessel Charter Agreements (the "Charter Agreements") under which Defendant BP chartered their vessels pursuant to the VoO program.

98.     Pursuant to the Charter Agreements, BP agreed that the General Maritime Laws of the United States should govern "all matters of construction, validity and performance" of the Charter Agreements, and that only in the event that the general maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern.

99.     The Charter Agreements were subsequently amended by letter agreement, stipulation and/or court order, and the amendments apply retroactively to the date of the initial signing of the Charter Agreements.

100.    In addition, Defendant BP made various statements and representations in the press, in court proceedings, on BP's website, and/or otherwise, in which BP

recognized and/or voluntarily assumed responsibility for the safety and protection of workers engaged in the VoO program.

101.    Defendant BP is subject to a court order that prevents it from attempting to enforce against VoO Plaintiffs any releases contained in Charter Agreements and/or other documents engaging VoO Plaintiffs.

102.    To qualify as a crew member on a VoO, a person must complete a four-hour worker safety training program.  Successful completion of the program results in the issuance of a "Petroleum Education Card."

103.    If BP deems that a vessel will come in contact with oil, it need only be staffed with one person who has completed a forty-hour Occupational Safety and Health Administration ("OSHA") Hazardous Waste Operations and Emergency Response awareness training class.

104.    BP requires vessels working near the source of the Oil Spill to provide crewmembers with respirators and appropriate training and fitting, but claims that no VoOs will be deployed near the source.

**C.      The Use of Chemical Dispersants**

105.    In addition to directing vessels at sea, BP coordinates and directs aircraft owned and/or operated by Defendants MSRC, O'Brien, Tiger, NRC, Lane, Dynamic, ASI, ASI International, Lynden, IAR and Defendant Corporations A-Z that fly out over the Gulf to spot oil slicks and to spray chemical dispersants to oil on the surface of the Gulf.

106.    In addition to the VoO Program, Onshore Plaintiffs were hired by BP, or BP's clean up and response contractors, Defendants MSRC, O'Brien, Tiger and NRC and Defendants Corporations A-Z, to clean up beaches, marshes, wetlands and other onshore

26

areas by removing polluted sand, collecting tarballs, laying or collecting boom, hand-applying dispersant in inland areas, and other related clean up efforts.

107.    Defendants BP, MSRC, O'Brien, Tiger and NRC and Defendants Corporations A-Z also engaged Decontamination Plaintiffs to decontaminate vessels that had come into contact with oil and/or chemical dispersants and/or other hazardous chemicals used resulting from the Oil Spill.

108.    Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants manufactured by Defendant Nalco to the resulting oil slicks and sheens on the surface of the Gulf.

109.    Generally, the United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep.    The Coast Guard's Federal On Site Coordinator (the "On Site Coordinator") must approve BP's requests to use chemical dispersants.

110.    The Material Safety Data Sheet ("Data Sheet") – a form that sets for the properties of a particular substance, including its toxicity and health effects -- for Nalco's Corexit® 9500 indicates that it contains the following hazardous substances: petroleum distillates, propylene glycol and organic sulfonic acid salt.  The Data Sheet for Nalco's Corexit® 9500 states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

111.    The Data Sheet for Nalco's Corexit® EC9527A indicates that it contains the following hazardous substances: 2-butoxyethanol (EGBE), organic sulfonic acid salt and propylene glycol.  The Data Sheet for Nalco's Corexit® EC9527A states that it is

harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

112.    Both Nalco's Corexit® products used by BP contain non-specified organic sulfonic acid salt, which is "moderately toxic."

113.    On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than Nalco's Corexit® dispersants BP had been using.

114.    On May 20, 2010, BP objected to changing dispersants and notified the EPA that it would continue using Nalco's Corexit®.

115.    BP's use of chemical dispersants skyrocketed: on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

116.    On May 26, 2010, the EPA directed BP to reduce overall use of Nalco's Corexit® by 75%.  The May 26, 2010 EPA directive also required BP to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On Site Coordinator.

117.    Since the May 26, 2010 EPA directive, BP has sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.

118.    According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP has applied 933,023 gallons by aerial application.  BP ordered the application by 386 flights, or sorties, as of that same date.  BP and Dispersant Defendants have covered approximately 291 square miles of the Gulf with dispersant.  As of June 26, 2010, 718,454 gallons of Nalco's Corexit® 9500 have been sprayed on the Gulf and

214,569 gallons of Nalco's Corexit® 9527.  Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.

119.    According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP makes use of at least 10 spray aircraft and eight spotter aircraft.  At least six spray planes leave from Stennis International Airport in Alabama.  At least four spray planes leave from Houma, Louisiana.

120.    MSRC owns at least six of the eight spotter aircraft used in connection with BP's aerial spraying of chemical dispersants.  MSRC and/or its contractor Dynamic operate the spotter aircraft.

121.    MSRC owns four of the ten spray planes used in connection with BP's aerial spraying of chemical dispersants. MSRC and/or its contractors, Lynden Air Cargo and/or Dynamic Aviation, operate the spray planes.

122.    ASI and/or ASI International own and operate at least two spotter aircraft and three spray planes used in connection with BP's aerial spraying of chemical dispersants.

123.    IAR owns and operates at least one spray plane used in connection with BP's aerial spraying of chemical dispersants.

124.    Dynamic owns and operates at least one spray plane used in connection with BP's aerial spraying of chemical dispersants.

125.    Lane owns one spray plane used in connection with BP's aerial spraying of chemical dispersants, which is operated by NRC.

126.    Defendants Corporations A-Z and Defendants John and Jane Does A-Z own and/or operate spray and spotter planes and spray boats used in connection with BP's application of Nalco's chemical dispersants.

127.    Upon information and belief, aerial dispersant sorties also leave from airfields in Florida and are conducted and orchestrated by BP, Dispersant Defendants and Defendants Corporations A-Z.

128.    Defendant Nalco knew or should have known that its chemical dispersants would be applied beneath the surface of the water, on the surface of the water, and aerially from planes.

**D.    Plaintiffs' Exposure to Harmful Chemicals**

129.    Upon information and belief, VoO Plaintiffs are working on boats, which are part of the "Vessel of Opportunity" Program that are dispatched to lay boom to absorb the oil, or to haul in oil saturated booms, among other activities.  In this capacity, Plaintiffs are exposed to crude oil and/or crude oil mixed with chemical dispersants.  In many instances, workers get sea water mixed with crude oil and/or chemical dispersants on their skin.  They also inhale fumes from the crude oil and/or chemical dispersants.

130.    Because Plaintiffs working on VoOs are not deemed by BP to be working near the source of the Oil Spill, they are not outfitted with respirators or equivalent safety devices.

131.    Upon information and belief, some VoO Plaintiffs have attempted to use respirators and masks not supplied by BP and have been prevented by BP, Dispersant Defendants, Defendants Corporations A-Z, and/or Defendants John and Jane Does A-Z from using them, as well as threatened with loss of VoO wages if they wear respirators.

132.   Upon information and belief, when VoOs spot oil slicks, they are instructed to contact BP directly and to provide BP with the coordinates of the slick. Upon receiving this information, Dispersant Defendants, Defendants Corporations A-Z, and/or Defendants John and Jane Does A-Z dispatch a spray plane from an airfield to the coordinates given and instruct the pilot to spray the chemical dispersant from its cargo hold.

133.   Upon information and belief, the VoOs are not given warning by BP, Dispersant Defendants, Defendants Corporations A-Z, and/or Defendants John and Jane Does A-Z of the plane's approach and are either directly or indirectly in the path of the spray zone, and/or the chemical dispersant spray drifts over the VoOs and its crew.

134.   VoO Plaintiffs' primary tasks are to lay boom to absorb the oil, or to haul in oil-saturated booms.  In this capacity, VoO Plaintiffs are exposed to crude oil, oil and dispersants and/or other harmful chemicals by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes when they haul in the booms.

135.   Upon information and belief, Vessel Plaintiffs in the vicinity of aerial spraying have also not received warning of aerial dispersant missions and have come into contact by inhalation and dermal exposure with dispersants and oil/dispersant mixtures, oil and/or other harmful chemicals.

136.   Onshore Plaintiffs' primary tasks are to lay boom, haul boom, install other barriers, collect tar balls, remove polluted sand contaminated with oil and/or dispersants and other activities.  In this capacity, Onshore Plaintiffs are exposed to crude oil by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes from spray mist.

137.    Upon information and belief, some Onshore Plaintiffs have attempted to use respirators and masks while hauling boom, collecting tar balls, removing oil and/or dispersant-polluted sand and other activities, and have been prevented by BP, Dispersant Defendants, Defendants Corporations A-Z and Defendants John and Jane Does A-Z from using respirators or masks, as well as threatened with loss of their clean up jobs if they do not abide by the instruction.

138.    Decontamination Plaintiffs' primary task is to spray and clean vessels that come into contact with oil and dispersants and other harmful chemicals resulting from the Oil Spill and the application of dispersants.  In this capacity, Decontamination Plaintiffs are exposed to crude oil and dispersants and other harmful chemicals by inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist.

139.    Resident Plaintiffs, due to the proximity of their homes and schools to the Gulf of Mexico, and the actions and omission by Defendants, have been exposed to oil, dispersants, and other harmful chemicals.

140.    Upon information and belief, when the chemical dispersant comes into contact with eyes, it causes irritation.  When the chemical dispersant comes into contact with skin, VoO Plaintiffs, Onshore Plaintiffs, Decontamination Plaintiffs and Vessel Plaintiffs complain of rashes, lesions and burns.

141.    Resident Plaintiffs live and/or work in close proximity to areas that are the subject of Defendants' remedial activities.  Due to their physical location, Resident Plaintiffs are subjected to fumes and odors from the oil and dispersants.

142.    Plaintiffs complain of the noxious odors and experience headaches, nausea, vomiting, respiratory problems and eye irritation, among other adverse health

effects associated with exposure to chemicals in the environment resulting from the Oil Spill.

*The Crude Oil*

143.     The crude oil contains benzene and other volatile organic compounds ("VOCs") – chemical compounds that can affect the environment and human health -- such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc.

144.     According to a presentation made in June 2010 to the Institute of Medicine of the National Academies entitled "Assessing the Human Health Effects of the Gulf of Mexico Oil Spill: An Institute of Medicine Workshop," dermal exposure to certain VOCs in crude oil can cause redness, swelling, irritation and rash and blisters on the skin and mucous membranes.  Inhalation exposure to certain VOCs in crude oil can cause ocular redness, soreness, watering and itching.  Inhalation exposure to certain other VOCs in crude oil can cause coughing, throat irritation, shortness of breath and wheezing. Inhalation exposure to other VOCs in crude oil can also affect the nervous system causing nausea, vomiting, dizziness, irritability, confusion and weakness of extremities. Ingestion of food or water containing VOCs from crude oil can cause nausea, vomiting and diarrhea.

145.     Chemicals such as benzene and PAHs are toxic components of crude oil and of grave concern.  These and many other chemicals in crude oil are volatile, moving from the oil into the air.  Once airborne, they can blow over the ocean for miles, reaching communities far from the spill.  They may be noticed as petroleum odors. Consequently,

both those working on the spill and people who are a distance from it can be exposed to crude oil chemicals in the air.

146.    According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen.  Benzene in the crude oil can cause a variety of specific effects described in the recent Centers for Disease Control ("CDC") summary of benzene toxicity:  ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

147.    A 2007 CDC review of benzene toxicity concluded that there is substantial human evidence that benzene causes leukemia.  It also reports aplastic anemia (a precursor of leukemia), chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system and abnormal development of blood cells.   When blood cells are deficient, this can cause other serious medical conditions, including infection due to a lack of leukocytes and increased cardiac stress due to a lack of erythrocytes.   Long term low level oral and inhalation exposures have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

148.    As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress:  "Oil can remain toxic in the environment for years."

34

*Corexit® 9500 and 9527*

149.    The dispersants used by BP and the Dispersant Defendants are known to cause headaches, nausea, vomiting, diarrhea, abdominal pains, dizziness, chest pains and tightness, irritation of the eyes, nose, throat and lung, decreased lung function, breathing difficulties, respiratory system damage, rapid breathing, asthma attacks, allergic reactions, skin irritation, damage, and sensitization, hypertension, damage to liver and kidneys, central nervous system depression, neurotoxic effects, damage to red blood cells, genetic damage and mutations, reproductive and developmental damage, immune system damage, cardiac arrhythmia, cardiovascular damage and increased severity of chronic obstructive pulmonary disease.

150.    BP, Dispersant Defendants, Defendants Corporations A-Z, and/or Defendants John and Jane Does A-Z used and continue to use the dispersants Corexit® 9500 and 9527 (more than 1.8 million gallons to date) to disperse the crude oil on the surface of the Gulf of Mexico and to disperse the crude oil near the wellhead 5,000 feet below the surface of the Gulf of Mexico.

151.    Nalco's Data Sheet for Corexit® 9500 indicates that it contains petroleum distillates, propylene glycol and organic sulfonic acid salt.  The Data Sheet states that it is an eye and skin irritant.  It is harmful if inhaled, if ingested, or if it comes into contact with skin.   If it comes into contact with the eyes or skin it can cause irritation.  It is harmful if absorbed through the skin. If ingested, it may cause chemical pneumonia.  If inhaled, it may irritate the respiratory tract.

152.    Nalco's Data Sheet for Corexit® EC9527A indicates that it contains 2-butoxyethanol (EGBE), organic sulfonic acid salt and propylene glycol.  The Data Sheet

states that it is an eye and skin irritant. It is harmful if inhaled, if ingested, or if it comes into contact with skin. If it comes into contact with the eyes or skin it can cause moderate irritation. It is harmful if absorbed through the skin. If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract. If inhaled, it may irritate the respiratory tract. Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

153. According to the New Jersey's EGBE Hazardous Substance Right to Know Fact Sheet, repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys and the liver. EGBE may be carcinogenic to humans. It is an eye, nose and throat irritant. It can cause nausea, vomiting, diarrhea and abdominal pain. Exposure to EGBE can also cause headache, dizziness, lightheadedness and unconsciousness. Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to the male and female reproductive systems in animals.

154. Both Corexit® products used by the Dispersant Defendants contain non-specified organic sulfonic acid salt.

155. Dioctyl sodium sulfosuccinate ("DSS") is an organic sulfonic acid salt. DSS is irritating to the eyes and throat, and it may cause aspirin's gastrointestinal effects (mucosal damage) to be increased. It is absorbed from the gastrointestinal tract and excreted largely in bile. Like many detergents, it has laxative effects. DSS can increase the uptake of mineral oil and phenophthalein, suggesting that it may also increase the uptake of other oils and chemicals. The Hazardous Substances Data Bank reports that the American Medical Association's Council on Drugs identified docusate salts as potentially being toxic to the liver and describes DSS as "moderately toxic."

156.    Corexit® 9500 contains hydrotreated light petroleum distillates, which are believed to be very similar to kerosene.  According to the CDC's profile for kerosene, it is a toxic fuel with extensive information regarding acute and chronic health effects. Kerosene can enter the body when it is absorbed through the skin, or through inhalation or ingestion.  It is poorly absorbed in the gastrointestinal system.  Kerosene can cause serious immediate respiratory health problems if substantial amounts are inhaled. In addition, inhalation or dermal exposure to kerosene can cause bronchoconstriction, which is relevant to asthmatics and other people with respiratory disorders.  Kerosene can damage the skin directly, causing blisters, erythema, peeling skin, reddening, soreness, burning, swelling and other damage.  Kerosene vapors can cause eye irritation.  Dermal exposure has caused hyperactivity and hyper-responsiveness to tactile stimulation.  Oral exposure to kerosene can cause vomiting, abdominal pain, gastroenteritis, bleeding and diarrhea.

157.    Propylene glycol has solvent properties and is used as a solvent in many applications.  It is present in both Nalco's Corexit® products used by BP and the Dispersant Defendants.  According to the ASTDR, propylene glycol is a mild irritant, and its role as an allergic dermal sensitizer is not resolved.  Exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat and lung irritation.  Some people are allergic to this chemical, and those with eczema may be at higher risk.  Erythema, edema, induration and other skin problems have been reported.

158.    Although not listed as a separate ingredient of the dispersants, when the dispersants are manufactured, a byproduct is formed at that time: 1,4 dioxane.  According to the Agency for Toxic Substances and Disease Registry, exposure to high levels of 1,4

dioxane can result in liver and kidney damage and death.  Inhalation of low levels of 1,4 dioxane can irritate the eyes and nose.  The U.S. Department of Health and Human Services reasonably anticipates that exposure to 1,4 dioxane causes cancer.  The California Environmental Protection Agency lists 1,4 dioxane as a known carcinogen.

### E.    Willful and Wanton Conduct of the Defendants

159.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* and during the subsequent attempt to clean the Oil Spill.  As demonstrated by the examples below, and by the foregoing factual allegations, Defendants' conduct evinced an ongoing willful, wanton, or reckless disregard for and indifference toward the safety of the people in the Gulf States and the environment of the Gulf of Mexico.

160.    Defendants BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

161.    Defendants BP and Transocean recklessly, willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs.

162.    Defendants recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs.

163.    Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed gross negligence, reckless indifference, willfulness and/or wantonness.

**F.    Defendants' Knowledge Of The Risks**

164.    OSHA, which promulgates regulations to protect worker safety in certain contexts, including hazardous waste activities and emergency responses, alerted the Coast Guard about its concerns over significant deficiencies in BP's Oil Spill response operations relating to worker safety.  OSHA repeatedly raised these concerns with BP as early as May 2010, but remained frustrated that BP did not address the most serious problems.

165.    Commercial fishing vessels and other vessels that make up the majority of the volunteer response vessels in the VoO are not otherwise subject to inspection by the Coast Guard, and the captains and crew are not customarily trained to recognize or to avoid health hazards in the context of an oil spill.  Using these types of vessels is not unknown in response efforts, but OSHA training is required to properly assess and to avoid risks.

166.    Uninspected fishing vessels being used in response actions without training and inspection subjects the captains and crews to exposure to harmful chemicals found in crude oil and chemical dispersants.

167.    BP and the Dispersant Defendants, aware of the risks that fishing vessels would face, ignored worker safety concerns, even in the face of OSHA warnings and notification by the Department of Health and Human Services that vessels and clean up workers were complaining of illnesses after being exposed to oil and dispersants.

168.    At all times relevant to this litigation, Defendants knew or should have known that:

   a.    crude oil contains chemicals hazardous to human health and to the environment and ecosystems;

   b.    chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems;

   c.    Plaintiffs should be adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

   d.    Plaintiffs should wear proper protective clothing and respirators.

169.    The Oil Spill and the resulting contamination and use of chemical dispersants have caused and will continue to cause harm to people living and working in the Gulf States and the Gulf of Mexico.

## V.    DAMAGES AND OTHER RELIEF REQUESTED

170.    As a result of Defendants' acts or omissions, many Plaintiffs have suffered the following physical injury damages:

   a.    Exposure to chemicals in crude oil that have caused adverse health effects;

   b.    Exposure to chemicals in weathered crude that have caused adverse health effects;

   c.    Exposure to chemicals in dispersants that have caused adverse health effects;

   d.    Exposure to chemicals in oil and dispersant mixtures that have caused adverse health effects; and

   e.    Costs incurred and inconvenience sustained by obtaining medical treatment for exposure to chemicals.

171.    Plaintiffs have suffered a discernible physical injury from exposure to oil, Nalco's dispersants, and/or oil and dispersant mixtures.

172.    Plaintiffs also demand injunctive and equitable relief and further, that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs.

173.    Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief set forth in more detail in this Master Complaint, and if Defendants are not ordered to create, fund and support a medical monitoring program.

174.    As a result of Defendants' acts or omissions, some Plaintiffs have suffered emotional distress caused by concern over exposure to chemicals.

175.    As a result of Defendants' acts or omissions, some Plaintiffs have suffered real and personal property damages caused by Defendants' response to the Oil Spill and exposure of personal property to crude oil, weathered crude, chemical dispersants and/or a combination of these chemicals, which renders the real and personal property diminished in value, in need of repair or destroyed.

## VI.    CLASS ALLEGATIONS

176.    Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated as members of a proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, adequacy, typicality and commonality requirements of Rule 23(a), and the predominance and superiority requirements of Rule 23(b)(3).

177.    Plaintiffs seek certification of a Class and three Subclasses.  The Class is defined as all persons who have been exposed to oil, dispersants and/or other hazardous chemicals use for or resulting from the Oil Spill.  The Class definition is subject to refinement as events unfold and discovery proceeds.

178.    The three Subclasses are defined as follows: all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill:

(a)    Subclass A is comprised of all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill and who presently have discernable physical injuries.

(b)    Subclass B is comprised of all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill but who yet have no manifestation of physical injuries.

(c)    Subclass C is comprised of all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill and whose real or personal property has been damaged as a result.

179.    Excluded from the Class are (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns and successors; and (2) the judge to whom this case is assigned and any member of the judge's immediate family.

### A.    Numerosity

180.    On information and belief, the Class consists of thousands of individuals who reside and/or work in the Gulf States and the Gulf of Mexico and have been injured by Defendants, making joinder impracticable.

### B.    Typicality

181.    The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, have been placed at risk

42

of adverse effects and/or property damage proximately caused by exposure to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill.

182.    Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all members of the Class.

### C.    Adequacy

183.    Plaintiffs will fairly and adequately represent and protect the interest of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort and complex class actions, including actions involving environmental contamination.

184.    Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

### D.    Commonality and Predominance of Common Issues

185.    There are numerous questions of law and fact common to all Class members, and those questions predominate over any questions that may affect only individual Class members that satisfy the requirements of Rule 23(a)(2) and 23(b)(3). Defendants subjected the Class members to the same unlawful conduct.

186.    The predominant, common questions include the following:

   a.   Whether Defendants were negligent in the use of dispersants and/or other hazardous chemicals;

   b.   Whether Defendants' use of oil, dispersants and/or other hazardous chemicals is a public nuisance;

   c.   Whether Defendants recklessly, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources

43

would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs;

d. Whether Defendants recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs;

e. Whether Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed gross negligence, reckless indifference, willfulness and/or wantonness;

f. Whether Defendants should be liable for the costs of future medical screening and monitoring;

g. Whether Defendants' use of dispersants as part of their response activities constitutes a battery;

h. Whether Defendants were negligent in failing to warn against harm that could occur if its dispersants were used in the manner contemplated by BP and the Dispersant Defendants;

i. Whether Defendant Nalco is strictly liable for designing a defective product as it relates to its chemical dispersants; and

j. Whether Defendant Nalco was negligent in designing and distributing unreasonably dangerous chemical dispersants.

**E.      Superiority**

187.     Absent class treatment, Plaintiffs and members of the Class will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct.

188.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights.  Because of the ratio of the economic value of the individual Class members' claims in comparison to the high litigation costs in complex

environmental mass torts cases such as this litigation, few could likely seek their rightful legal recourse.  Absent a class action, Class members would continue to incur harm without remedy.

189.    The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

### F.    Federal Rules Relating to Class Actions

190.    The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class and Subclass Members would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass Members that would establish incompatible standards of conduct for the party opposing the Class and Subclasses; or adjudications with respect to individual Class and Subclass Members that, as a practical matter, would be dispositive of the interests of the other Class and Subclass Members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

191.    The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the Class and Subclasses, so that final injunctive relief is appropriate respecting the Class and Subclasses as a whole.

192.    The common questions set forth above predominate over Class and Subclass Members' individual issues.

193.    A class action is superior to other methods of dispute resolution in this case.  The Class and Subclass members have an interest in class adjudication rather than

individual adjudication because of the overlapping rights.  It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class and Subclass members would protect their rights on their own without this class action case.  Management of the Class and Subclasses will be efficient and far superior to the management of individual lawsuits.

## VII.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### The Oil Pollution Act

### (All Plaintiffs With Property Damage v. BP Exploration, Anadarko LP, Anadarko, MOEX and Transocean Holdings)

194.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

195.   The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA") imposes liability upon a "responsible party for a... facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

196.   The Coast Guard has treated BP Exploration, Anadarko LP, Anadarko, MOEX, and Transocean Holdings as "responsible parties."  Therefore, BP Exploration, Anadarko LP, Anadarko, MOEX, and Transocean Holdings are liable pursuant to Section 2702 for all the damages that result from the Oil Spill.

197.   As a direct and proximate cause and post explosion clean-up efforts from the Oil Spill, certain Plaintiffs have sustained damage to their real and/or personal property as a result of the post-explosion clean-up activity, and they are entitled to

recover from BP Exploration, Anadarko LP, Anadarko, MOEX and Transocean Holdings for such damages in amounts to be determined by the trier of fact.

198.   Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery for damages to real and/or personal property, including "damages for injury to, or economic losses resulting from destruction of, real and/or personal property, which shall be recoverable by a claimant who owns or leases that property."

199.   Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

200.   To the extent required by law, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all of the Defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF"), and/or BP, and/or its agents or designees.

201.   In its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

## SECOND CLAIM FOR RELIEF

### General Maritime

**(Medical Monitoring As An Element Of Damages)**

**(VoO Plaintiffs v. BP Defendants, Corporations A-Z, and John and Jane Does A-Z)**

202.   VoO Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

47

203.   VoO Plaintiffs were injured while acting as seamen in the service of a vessel under a Master Vessel Charter Agreement with BP as set forth herein.

204.   VoO Plaintiffs who are vessel owners and who participated in the VoO program entered into a Master Vessel Charter Agreement ("Charter Agreement") under which Defendant BP chartered their vessels pursuant to the VoO program.

205.   Pursuant to the Charter Agreement, BP agreed that the General Maritime Laws of the United States should govern "all matters of construction, validity and performance" of the Charter Agreement, and that only in the event that the general maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern.

206.   The Charter Agreement was subsequently amended by letter agreement, stipulation and/or court order, said amendments applying retroactively to the date of the initial signing of the Charter Agreement.   In addition, Defendant BP made various statements and representations in the press, in court proceedings, on BP's website, and/or otherwise, in which BP recognized and/or voluntarily assumed responsibility for the safety and protection of workers engaged in the VoO program.

207.   VoO Plaintiffs have been exposed to greater than normal background levels of the oil, dispersants, and/or other hazardous chemicals used for combating or resulting from the Oil Spill.

208.   The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which VoO Plaintiffs have been exposed.

209.   VoO Plaintiffs' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

210.   The method and means for diagnosing the VoO Plaintiffs' potential medical problems are well-accepted in the medical and scientific community and will be of great benefit to VoO Plaintiffs by preventing or minimizing health problems that VoO Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

211.   As a proximate result of VoO Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill, VoO Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

212.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

213.   The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

214.   VoO Plaintiffs have required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and have not reached maximum medical improvement.

215.   Defendants BP, Corporations A-Z and John and Jane Doe A-Z have denied such payment and/or have paid benefits in an insufficient amount.

216.    As a result of Defendants BP, Corporations A-Z and John and Jane Doe A-Z's failure to pay and/or delay in timely providing and/or paying the proper amount, VoO Plaintiffs have suffered further injuries and damages.

217.    Defendants BP, Corporations A-Z and John and Jane Doe A-Z's failure to provide benefits has been callous, willful, wanton, or otherwise tortuous, for which punitive damages are recoverable.

218.    Defendants BP, Corporations A-Z and John and Jane Doe A-Z are also liable for all reasonable and necessary attorney's fees and costs incurred on VoO Plaintiffs' behalf in seeking to secure proper benefits from Defendants BP, Corporations A-Z and John and Jane Doe A-Z.

### THIRD CLAIM FOR RELIEF

### Negligence

### (All Plaintiffs v. All Defendants Except Nalco)

219.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

220.    BP has taken control and directs all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date.  BP owed a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.  Defendants failed to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

221. At all times relevant to this litigation, Defendants knew or should have known that:

    a. crude oil contains chemicals hazardous to human health and to the environment and ecosystems;

    b. chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems;

    c. Plaintiffs should be adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

    d. Defendants' failure to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

222. Defendants' conduct fell below the duty of care owed to Plaintiffs amounting to a breach of that duty. Defendants owed Plaintiffs the following duties:

    a. a duty to warn Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

    b. a duty to properly train and equip Plaintiffs to avoid exposure to hazardous substances encountered in connection with relief efforts;

    c. a duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

    d. a duty to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

    e. a duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiffs.

223.   Plaintiffs suffered injury and loss as a result of Defendants' breach of their aforementioned duties.   Specifically, Defendants breached their duties owed to the Plaintiffs by:

      a.  failing to warn the Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous substances which they contain, which have come into contact with Plaintiffs' persons and the local environment and ecosystems;

      b.  failing to properly train and equip Plaintiffs to avoid exposure to hazardous substances encountered in connection with relief efforts;

      c.  failing to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

      d.  failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

      e.  failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiffs.

224.   All of Plaintiffs' damages were caused in fact by Defendants' breach of their duties.

225.   Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs.

226.   Defendants are liable in ordinary negligence to Plaintiffs.

227.   The danger and risk of harm to Plaintiffs was reasonably foreseeable.

228.   Defendants' breach of their duties was the direct and proximate cause of all of Plaintiffs' damages, and Defendants are liable therefor.

## FOURTH CLAIM FOR RELIEF

### Gross Negligence

### (All Plaintiffs v. All Defendants)

229.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

230.    Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the manufacture, maintenance and operation of the *Deepwater Horizon*, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Oil Spill which occurred herein.  The existence and breach of these legal duties are established under the General Maritime Law and state law as deemed applicable herein.

231.    Defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date, including the use of Nalco's chemical dispersants.  Defendants owed and breached a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.  The existence and breach of these legal duties are established under the General Maritime Law and state law as deemed applicable herein.

232.    Defendants had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

233.    Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to contain the Oil Spill.

234.    Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause Plaintiffs' injury and/or property damage.

235.    As a direct and proximate cause of Defendants' wanton or reckless acts, Plaintiffs have suffered physical injuries and/or property damage.

236.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages.  The amount of punitive damages recoverable by Plaintiffs is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of same sufficient to both punish Defendants and deter similar wrongdoing in the future.

### FIFTH CLAIM FOR RELIEF

### Negligence *Per Se*

### (All Plaintiffs v. All Defendants)

237.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

238.    Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws.  These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiffs,

including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

239.   One or more of Defendants violated these statutory and/or regulatory standards.

240.   Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida law.

241.   Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein which in turn caused Plaintiffs' injuries and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

242.   As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, the Plaintiffs have suffered physical injuries and/or property damage.

## SIXTH CLAIM FOR RELIEF

### Negligence

### (All Plaintiffs v. Nalco)

243.   Plaintiffs adopt and reallege paragraphs 1-23, 66-159, 162-163, 167-193 as if fully restated here.

244.   Plaintiffs are entitled to recover from Nalco for its negligence with respect to the design, manufacture, marketing, sale and/or distribution of Corexit®.

245.     At all times relevant hereto, Nalco was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

246.     Nalco sold and delivered the Corexit® to BP and the Dispersant Defendants immediately after the Oil Spill and placed the Corexit® in the stream of commerce.

247.     Nalco knew that the Corexit® would be used without inspection for defects.

248.     Nalco's chemical dispersants were unreasonably dangerous to Plaintiffs for their intended purpose when the dispersants left Nalco's control.

249.     At all times, Nalco's dispersants were used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to BP prior to sale of the dispersants.

250.     When the Corexit® was used, it was in substantially the same condition when it was sold.

251.     At the time the dispersants left Nalco's control, Nalco knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Plaintiffs who were not properly equipped with protective gear.

252.     At the time the dispersants used in response to the *Deepwater Horizon* disaster left Nalco's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the dispersant.

56

253.    At all relevant times, the dispersant was used in an intended and/or reasonably foreseeable manner.

254.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the dispersants.

255.    The design defect in the Corexit® is its toxicity to humans and its ability to cause physical injury, health hazards, and damage to property because of its toxicity.

256.    Nalco had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Plaintiffs' injuries, and its actions and inactions were negligent, grossly negligent, reckless, willful and/or wanton.

257.    As a direct and proximate result of the design defect, Plaintiffs have suffered physical injury damages, damage to or diminution of the value of their real and/or personal property, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual, compensatory and punitive damages.

258.    In the alternative, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); the Alabama Extended Manufacturer's Liability Doctrine; and Florida common law.

## SEVENTH CLAIM FOR RELIEF

### Nuisance

### (All Plaintiffs v. All Defendants)

259.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

260.     BP's oil disaster has significantly interfered with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution.

261.     Prior to the *Deepwater Horizon* disaster, Plaintiffs enjoyed the use of the Gulf of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico.

262.     Since the disaster, Plaintiffs have been unable to fish or boat, and many have lost their livelihoods.

263.     As a direct and proximate cause  of the oil disaster, and VoO, Decontamination, and Onshore Plaintiffs' work to assist in the relief effort, these Plaintiffs are exposed to harmful chemicals in the crude oil and in the chemical dispersants at levels, amounts, and under conditions different from the general public.

264.     As a result of the oil disaster, Resident Plaintiffs are constantly exposed to harmful chemicals in the air from oil, dispersants, and/or other harmful chemicals resulting from the Oil Spill at levels, amounts, and under conditions different from the general public.

265.     Moreover, all Plaintiffs are subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants.

266.    Plaintiffs have no adequate remedy at law.

267.    There exists an imminent likelihood of irreparable harm if the injunction is not issued.

268.    The threatened harm to the Plaintiffs and class members outweighs any potential harm to Defendants.

269.    Granting the injunction does not contravene a substantial public interest.

270.    Plaintiffs have a substantial likelihood of success based on the allegations, and Plaintiffs' allegations are likely to be proven and are not merely speculative.

271.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages, including costs of future medical screening and monitoring, for the creation of a public nuisance and a judgment for injunctive relief to abate the nuisance.

## EIGHTH CLAIM FOR RELIEF

### Battery

### (VoO and Vessel Plaintiffs v. All Defendants)

272.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

273.    Defendants place VoO Plaintiffs on VoOs without adequate training, warning of risks, or safety equipment.

274.    Defendants intentionally sprayed, and/or directed spraying, chemical dispersants in the immediate vicinity of VoO Plaintiffs or Vessel Plaintiffs.

275.    Defendants' spraying of chemical dispersants in the immediate vicinity of Plaintiffs on VoOs without warning or safety equipment has caused some VoO Plaintiffs

to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

276.    Defendants spraying of chemical dispersants in the immediate vicinity of Vessel Plaintiffs without warning has caused some Vessel Plaintiffs to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

277.    VoO and Vessel Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages suffered as a result of subjecting Plaintiffs to unwanted, offensive conduct and enjoining Defendants' tortious conduct toward VoO and Vessel Plaintiffs.

**NINTH CLAIM FOR RELIEF**

**<u>Florida Medical Monitoring Claim</u>**

**(Florida Plaintiffs v. All Defendants)**

278.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

279.    Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief set forth herein, and if Defendants are not ordered to create, fund and support a medical monitoring program as set forth herein.

280.    Plaintiffs demand injunctive and equitable relief and that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs in Florida.

281.    Plaintiffs have been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

282.    The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiffs have been exposed.

283.    Plaintiffs' exposures were caused by Defendants' negligence or otherwise tortious conduct.

284.    Plaintiff's exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

285.    The method and means for diagnosing Plaintiffs' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

286.    As a proximate result of Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals which have been released from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

287.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

288.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## TENTH CLAIM FOR RELIEF

## <u>Strict Liability Under General Maritime Law</u>

### (All Plaintiffs v. Nalco)

289.    Plaintiffs adopt and reallege paragraphs 1-21, 55-152, 155, 157, and 160-186, as if fully restated here.

290.    Plaintiffs are entitled to recover from Nalco for its defective design of Corexit®.

291.    At all times relevant hereto, Nalco was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

292.    Nalco sold and delivered the Corexit® to BP and the Dispersant Defendants immediately after the Oil Spill and placed the chemical dispersants in the stream of commerce.

293.    Nalco knew that the Corexit® would be used without inspection for defects by consumers.

294.    Nalco's dispersants were unreasonably dangerous to Plaintiffs for its intended purpose when it left Nalco's control.

295.    When BP and Dispersant Defendants used Corexit®, it was in substantially the same condition when it was sold.

296.    At all times, Nalco's dispersants were used in a manner consistent with the uses intended by or known to Defendant and in accordance with Defendant's directions and instructions.

297.    At all relevant times, the dispersant was used in an intended, or in a manner reasonable foreseeable and/or actually disclosed to BP prior to sale of the dispersants.

298.    At the time the dispersants left Nalco's control, Nalco knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Plaintiffs who were not properly equipped with protective gear.

299.    At the time the dispersants used in response to the *Deepwater Horizon* disaster left Nalco's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the dispersant.

300.    At all relevant times, the dispersant was used in an intended and/or reasonably foreseeable manner.

301.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the dispersants.

302.    The design defect in the Corexit® is its toxicity to humans and its ability to cause physical injury, health hazards, and damage to property because of its toxicity.  The Corexit® was also defectively inspected, tested, marketed and sold.

303.    Defendant's product was not misused or altered by any third parties, Plaintiffs or class members.

304.    Nalco had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed Plaintiffs' injuries, and its actions and inactions were grossly negligent, reckless, willful and/or wanton.

305.    As a direct and proximate result of the design defect, Plaintiffs have suffered physical injury damages, damage to or diminution of the value of their real and/or personal property, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual, compensatory and punitive damages.

306.    In the alternative, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); the Alabama Extended Manufacturer's Liability Doctrine; and Florida common law.

## ELEVENTH CLAIM FOR RELIEF

### Strict Liability Pursuant To The Florida Pollutant Discharge Prevention And Control Act Fla. Stat. § 376.011, *et seq*

### (Plaintiffs v. All Defendants)

307.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

308.    At all relevant times, BP and Transocean owned, leased, operated, and/or maintained the Deepwater Horizon and the Macondo well.  Following the April 20, 2010 explosion, fire, and ultimate sinking of the Deepwater Horizon, the Macondo well began spewing crude oil into the Gulf of Mexico.

309.    At all relevant times, Defendants had a statutory duty to Plaintiffs to maintain and operate the Deepwater Horizon and the Macondo well, and/or to conduct post-Oil Spill remedial efforts so as to not create or sustain hazardous conditions due to the discharge of pollutants as defined by the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. § 376.031.

310.    At all relevant times, Defendants breached their statutory duty to Plaintiffs by discharging, or allowing to be discharged, crude oil into the Gulf of Mexico and allowing the Oil Spill and/or chemical dispersants to migrate into Florida's marine and coastal areas, in violation of the Act, Fla. Stat. §§ 376.011 - 376.21. Those affected waters and shores are the location of Plaintiffs' properties.

311.    Defendants are strictly liable to Plaintiffs under the Florida Act, § 376.205, which provides in pertinent part:

> … any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§ 376.011-376.21. In any such suit, it shall not be necessary for the person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred.

312.    The Florida Act creates a private cause of action.  *See* Fla. Stat. § 376.205. The Florida Act provides that "[e]ach responsible party is liable to any affected person for all damages as defined in section 376.031, excluding natural resource damages, suffered by that person as a result of the discharge."  Fla. Stat. § 376.12(5).

313.    The Coast Guard has named BP as the responsible party for the downhole release of oil, and Transocean as the responsible party for the release of diesel on the surface.  Therefore, BP and Transocean are liable under the Florida Act for all damages, as defined by the Florida Act, that result from the Oil Spill.

314.    The private cause of action under the Florida Act is a strict liability cause of action.  The Plaintiffs "need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred."  Fla. Stat. § 376.205.  The Oil Spill constitutes a prohibited discharge within the meaning of the Florida Act and it has occurred.

315.    The immediate discharge from the Oil Spill, and the application of chemical dispersants, occurred in waters outside the territorial limits of Florida; however, lands and waters within the territorial limits of Florida have been directly affected by the discharge and are reasonably expected to continue to be so affected.

316.    As a result of the Oil Spill, certain Plaintiffs have sustained damage to their real and/or personal property as a result of the post-explosion clean-up activity, and they are entitled to recover from Defendants for such damages in amounts to be determined by the trier of fact.

317.    Plaintiffs are entitled to such damages pursuant to Fla. Stat. § 376.031(5), which defines "damages" as "the documented extent of any destruction to or loss of any real and/or personal property, or the documented extent, pursuant to § 376.121, of any destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant."

318.    The Florida Act contains no presentation requirement.

319.    As the direct and proximate result of Defendants' breach of statutory duty to Plaintiffs, the Oil Spill originating from the Macondo well and the post-Oil Spill remedial efforts and use of dispersants has resulted in detrimental effects upon Plaintiffs' real and/or personal property.

320.    By reason of the foregoing, Plaintiffs have incurred damages in an amount to be determined at trial, and are entitled to compensatory and punitive damages.

## **Punitive Damages**

321.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

322.    Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.  Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein..

323.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

324.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

325.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

326.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on

the Deepwater Horizon by using a well design with too few barriers to gas flow.

327.  BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

328.  BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

329.  BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

330.  BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

331.  BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

332.  BP and Transocean focused primarily on profit while disregarding public

and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

333.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

334.   BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

335.   BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

336.   BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

337.   BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

338.   BP recklessly, willfully and/or wantonly failed to utilize reasonably safe

dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

339.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

340.    Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

> (a)    failed to properly maintain and/or operate the Deepwater Horizon;
>
> (b)    operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;
>
> (c)    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;
>
> (d)    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

(e)   violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

(f)   failed to take appropriate action to avoid or mitigate the accident;

(g)   failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h)   failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

(i)   failed to provide appropriate disaster prevention equipment;

(j)   failed to have an appropriate emergency spill response plan or readily available spill response equipment.

341.   BP and Dispersant Defendants recklessly, willfully and/or wantonly caused or contributed to Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

342.   BP and Dispersant Defendants recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

343.   Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

344.     BP and Nalco recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

345.     Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

346.     Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class demand judgment against Defendants jointly, severally and solidarily, as follows:

1. Economic and compensatory damages in amounts to be determined at trial;

2. punitive damages;

3. damages for medical screening and monitoring;

4. the implementation of a medical screening and monitoring program to be funded by the Defendants;

5. an order certifying the Class and/or Subclasses under the appropriate provisions of F.R.C.P. 23 as set forth herein, appointing Plaintiffs as Class and/or Subclass Representatives, and appointing undersigned counsel as counsel for the Class and/or Subclasses;

6. pre-judgment and post-judgment interest at the maximum rate allowable by law;

7. attorneys' fees and costs of litigation;

8. injunction to abate the public nuisance created by Defendants;

9. injunction to abate the unwanted, offensive conduct by Defendants;

10. injunction to require monitoring of air and water;

11. any other and further relief available under all applicable state and federal laws; and

12. any other and further relief the Court deems just and proper.

Dated: December 15, 2010

Respectfully submitted,

_____/s/   Stephen J. Herman_____          _____/s/ James Parkerson Roy_____
Stephen J. Herman, La. Bar No. 23129          James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR LLP              DOMENGEAUX WRIGHT ROY & EDWARDS LLC
820 O'Keefe Avenue                            556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                  Lafayette, Louisiana 70501
Telephone: (504) 581-4892                     Telephone: (337) 233-3033
Fax No. (504) 569-6024                        Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                      E-Mail: jimr@wrightroy.com

*Plaintiffs' Liaison Counsel*                 *Plaintiffs' Liaison Counsel*
*MDL 2179*                                    *MDL2179*

### PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS, MITCHELL,<br>ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office:  (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY  10003<br>Office:  (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail: rgreenwald@weitzlux.com<br><br>Rhon E. Jones |

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO & WALKER
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on December 15, 2010.


      /s/   Stephen J. Herman and James Parkerson Roy_____