## ATTACHMENT "A"

### The Economic Impact of the Oil Spill and Injuries to Plaintiff

1.      The Oil Spill has and continues to impact the Gulf Coast's and Alabama's shorelines and coastal areas, threatening Plaintiff's livelihoods and business operations.

2.      Plaintiff owned real property located within the coastal areas impacted by the Oil Spill.

3.      Plaintiff is a Real Estate Developer who develops residential, commercial, and/or industrial properties including condominiums with multiple residential units, and, as such, is excluded from the Deepwater Horizon Economic and Property Damages Settlement Class.

4.      At all times material hereto, Plaintiff owned, and continues to own, a parcel of real property situated directly on the Gulf of Mexico and located at 27070 Perdido Beach Boulevard, Orange Beach, Baldwin County, Alabama ("the site").

5.      The site is a portion of the Perdido Dunes Condominium, originally developed in 1984, and consists of approximately .57 acres extending to and touching the Gulf of Mexico with approximately 100 feet of shoreline.

6.      The site is zoned BR-2, Beach Resort District (High Density) and has entitlement for up to 24 residential units.

7.      After Hurricane Ivan completely destroyed the eight (8) unit condominium building located on this site, Plaintiff worked with the City of Orange Beach, legal counsel, design professionals and environmental specialists to build a new 20 unit condominium tower in place of the destroyed building.  The units were to be sold to tourists and others wanting to purchase a Gulf-front residence.  From the sale of these units, Plaintiff was to earn income and profit.

8.    As of April 20, 2010, Plaintiff had all construction design plans, zoning approvals, construction permits, environmental permits and all other requirements necessary to begin construction.

9.    As of April 20, 2010, Plaintiff had not declared bankruptcy, initiated total or partial asset liquidation, or debt restructuring.  Also, Plaintiff was in compliance with all covenants regarding outstanding debt.

10.    In the beach condominium development business, the summer months are always strong selling months because of the influx of a large volume of tourists who travel to the Alabama Gulf Coast to enjoy its pristine white sandy beaches.  In order to capitalize on this prime marketing time, Plaintiff began gearing up in the Fall and Winter months of 2009 to be ready to conduct a major marketing campaign during the Summer of 2010.  Plaintiff worked with realtors and others to develop marketing materials designed to promote interest in Perdido Dunes Towers and to secure pre-construction sales.  Large advertising signs were designed and installed at the development build site, brochures and other marketing materials were developed and distributed to realtors, members of the Plaintiff LLC, potential buyers and other interested parties.

11.    It is standard practice in the condominium development industry for developers to seek and obtain pre-construction verbal commitments to purchase units in a proposed development.  Once the developer secures a sufficient number of commitments to begin construction, all the commitments are committed to "hard," or written, contracts.  The reason for first securing a verbal commitment is because once a pre-construction hard contract is executed state law requires that the developer provide the buyer with a certificate of occupancy for his or her unit within twenty-four months.  Thus, a condominium developer routinely does not execute

hard contracts with all of its committed pre-construction buyers until the developer is certain that it is ready to break ground and will be able to complete construction within 24 months.

12.     Plaintiff hoped to secure several pre-construction sales commitments and go to hard contract on those by the end of the Summer of 2010.  Securing these commitments and going to hard contact would enable Plaintiff to pay the initial construction cost requirements and begin construction in September or October of 2010.  This start date would have enabled the development to be ready for its first required inspection by December 2010.  Plaintiff's contractor also assured Plaintiff that the tower would easily have been completed within twenty-four months of the signing of those late Summer 2010 hard contracts.

13.     From the time Plaintiff began its marketing campaign in early 2010 until the Oil Spill in April, Plaintiff successfully secured solid pre-construction sales commitments for six of the proposed 20 units in the development.

14.     These commitments were scheduled to go to hard contract by the end of Summer 2010.  These commitments, once committed to hard contract, were sufficient to provide Plaintiff with adequate financing to initiate construction by September 2010.

15.     The Oil Spill prevented tourists from coming to Orange Beach, therefore foreclosing Plaintiff of the benefit of extremely favorable marketing opportunities that a full tourist season brings to this type of development.

16.     Oil from the Oil Spill washed up and was deposited on Plaintiff's approximately 100 feet of Gulf of Mexico shoreline.

17.     As the property was directly oiled and physically damaged, this severely restricted marketing opportunities and completely deterred interested buyers from committing to purchase a unit in the Perdido Dunes Tower development.

18.     When the Oil Spill occurred it caused an immediate and negative impact on the marketability and sale price of residential real property on the Gulf of Mexico, especially properties like Plaintiff's proposed Gulf-front condominium tower.

19.     At the time of the Oil Spill, Plaintiff's Perdido Dunes Tower was one of only two Gulf-front developments in Baldwin County, Alabama to possess all the construction and other permits necessary to construct a high density residential property.

20.     The volatile and uncertain real estate market conditions created as a direct and foreseeable result of the Oil Spill caused six of the committed buyers to cancel their pre-construction agreements to each purchase one condominium unit in the development (a total loss of 6 pre-construction unit sales).

21.     The loss of these six pre-construction sales as a direct and foreseeable result of the Oil Spill made it impossible for Plaintiff to proceed with the construction of the condominium development because Plaintiff no longer could meet the costs required to begin construction.

22.     Thus, the Oil Spill has proximately, directly, and foreseeably caused Plaintiff to be unable to begin construction or to construct its proposed condominium tower.

23.     The inability to begin construction as a direct and foreseeable result of the oil spill has caused Plaintiff to suffer lost profit, lost earning capacity, and/or other damages discussed below.

24.     As a direct and foreseeable result of the Oil Spill, Plaintiff has suffered significant financial losses and other damages, including but not limited to:  lost income and profit on the lost pre-construction sales and prospective post construction sales of its condominium units; Plaintiff's out-of-pocket costs for the development; a loss of the value of its real property; costs to mitigate Plaintiff's damages; costs to assess Plaintiff's damages, carrying costs; and other

losses and damages.

25.     As a direct and foreseeable result of the Oil Spill, Plaintiff has suffered damages and economic loss resulting from the damage to or destruction of its real property and an interference with its property rights regarding its real property.  Moreover, because the oil spill has made construction impossible, as a direct and foreseeable result of the Oil Spill Plaintiff has and continues to suffer a total loss of use of its property.

26.     In an effort to mitigate and recover their damages, Plaintiff continued to market and promote its development and to seek pre-construction sales for its condominium units.

27.     At the time of filing this Complaint, Plaintiff has managed to maintain and keep current all construction permits and other requirements to begin construction of the development.

<h2 style="text-align:center">"PRESENTMENT" UNDER OPA</h2>

28.     To the extent required by law, and/or by consent and/or stipulation by BP, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b) by the submission of their claims to the BP OPA Claims Program, the Deepwater Horizon Court-Supervised Settlement Program and/or the Gulf Coast Claims Facility.

29.     In particular, on January 18, 2013, Plaintiff submitted a completed "BP Claims Program – Claim Form for Individuals and Businesses" and a "Notice of Claim," including a "sum certain," a description of the incident and claim, and supporting documentation to BP as the "responsible party" under OPA via e-mail to the email address provided by the BP Claims Program, and followed by sending a hardcopy of all documents to the responsible party via US Mail.

30.     BP did not settle Plaintiff's Claim by payment within 90 days of presentment.

31.     Because Plaintiff previously provided notice of their claims to BP as the

responsible party, the presentment made on or about January 18, 2013 was made (and/or re-made) out of an abundance of caution.   Plaintiff first provided notice of their claim on or about June 28, 2010 by filing a claim with the BP Claims Program.  Plaintiff's claim was assigned claim number 6866124537193.  Thereafter, Plaintiff's claim was transferred to the Gulf Coast Claims Facility and Plaintiff was assigned Claimant number 1087117.

32.     Plaintiff's claim was denied by the GCCF on August 10, 2011.

33.     Plaintiff again provided notice of their claim to the responsible party through their "Oil Pollution Act Notice of Claim for Damages" served on or about February 15, 2011 on the following entities: BP America, Inc.; Mr. Geir Robinson, Claims Manager, BP America, Inc.; BP p.l.c., International Headquarters; BP Products North America, Inc.

34.     BP failed to settle Plaintiff's February 15, 2011 claim within 90 days of presentment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants, jointly, severally, and *in solido,* as follows:

1. Economic and compensatory damages in amounts to be determined at trial;

2. Punitive Damages;

3. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

4. Reasonable claims preparation expenses;

5. Attorneys' fees;

6. Costs of litigation; and

7. Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

## RESERVATION OF RIGHTS

### *Right to a Trial by Jury*

Plaintiff demands a jury trial for any and all claims pleaded herein in which a jury trial is available by law.

### *Right to File Amendments*

Plaintiff reserves the right to amend this complaint and/or file additional complaints to supplement Plaintiff's present claims or assert additional claims against the Defendants named herein and/or against any additional parties.