# IN RE: OIL SPILL by "Deepwater Horizon"

## AMENDMENT TO DIRECT FILING SHORT FORM (or PLAINTIFF PROFILE F

Authorized by Order of the Court, Civil Action No. 10-md-2179 Rec. Doc. 4043
(Copies of said Order having also been filed in Civil Actions No. 10-8888 and 10-2771)

LEXISNEXIS® FILE & SERVE
39867239
E-SERVICE
Sep 16 2011
4:09PM

**Please include any information that adds to or is different from your original Short Form or Plaintiff Profile Form.**
*(It will be presumed, for all spaces left blank on this form, that the information is the same.)*

| MDL 2179 and Civil Action No. 10-2771 | SECTION: J | JUDGE CARL BARBIER |
|---|---|---|

### CLAIM IN LIMITATION / JOINDER IN MASTER ANSWER / INTERVENTION AND JOINDER IN MASTER COMPLAINTS – PLAINTIFF/CLAIMANT PROFILE AMENDMENT FORM

**By submitting this document, I, or the business I am authorized to act for, hereby amend the claims or information provided in the Short Form (or Plaintiff Profile Form) identified below.**

**Short Form** filed?     YES ■    NO ☐

If yes, list your **Original Short Form Document Number** (this is the document filing number to you upon filing your Short Form with the Court).

Short Form Document No.: 595 _____ (filed in No. 10-8888).

**Plaintiff Profile Form** served?     YES ☐    NO ■

If yes, list your **"LexisNexis® File & Serve" Number** (this is the 8-digit number stamped on the Plaintiff Profile Form when it is filed on LexisNexis® File & Serve.

LexisNexis® File & Serve No.: _____

**If yes, please provide the following information about your original case:**

Original Case Caption: _____

Original Civil Action No.: _____

Originating Court: _____

EDLA Civil Action No.: _____

| Last Name | First Name | Middle Name/Maiden | Suffix |
|---|---|---|---|
| Gibson | Jonathan | T. | |

| Phone Number | E-Mail Address |
|---|---|
| | |

| Address 2206 Duboin Road | City / State / Zip New Iberia, Louisiana 70560 |
|---|---|

| INDIVIDUAL CLAIM ☐ | BUSINESS CLAIM ✓ |
|---|---|
| Employer Name | Business Name Pan Ocean Energy Services, LLC |
| Job Title / Description | Type of Business Oilfield Equipment Manufacturing & Commissioning |
| Address | Address 2206 Duboin Road |
| City / State / Zip | City / State / Zip New Iberia, Louisiana 70560 |

---

[1] **If amending a Short Form**, this form should be filed with the U.S. District Court for the Eastern District of Louisiana, 500 Poydras Street, New Orleans, Louisiana 70130, in Civil Action No. 10-8888.   **If amending a Plaintiff Profile Form**, this form should be served on all counsel using LexisNexis® File & Serve, as provided in Pre-Trial Order No. 12 [Doc. 600].

1

| Last 4 digits of Social Security Number | Last 4 digits of Tax ID Number 3673 |
|---|---|
| Attorney Name (if applicable) John E. Tomlinson | Firm Name (if applicable) Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
| Address 218 Commerce Street | City / State / Zip Montgomery, AL 36104 |
| Phone Number (334) 269-2343 | E-Mail Address John.Tomlinson@BeasleyAllen.com |

| | |
|---|---|
| Claim filed with BP?    YES ☑  NO ☐ | Claim Filed with GCCF?    YES ☑  NO ☐ |
| If yes, list BP Claim No.: 1002969-01 | If yes, list Claimant Identification No.: 3481802 |

**Claim Type (Please check all that apply):**

- ☐ Damage or destruction to real or personal property
- ☑ Earnings/Profit Loss
- ☐ Personal Injury/Death
- ☐ Fear of Future Injury and/or Medical Monitoring
- ☑ Loss of Subsistence use of Natural Resources
- ☐ Removal and/or clean-up costs
- ☐ VoO Charter Dispute
- ☐ Other _____

Case 2:10-cv-08888-CJB-SS Document 134367 Filed 04/20/13 Page 3 of 13

**Brief Description:**

1. **For earnings/profit loss, property damage and loss of subsistence use claims, describe the nature of the injury. For claims involving real estate/property, include the property location, type of property (residential/commercial), and whether physical damage occurred. For claims relating to fishing of any type, include the type and location of fishing grounds at issue.**

Claimant Pan Ocean Energy Services, LLC ("Pan Ocean Energy") has filed a Complaint for damages in the United States District Court, Eastern District of Alabama, on April 19, 2013. Out of an abundance of caution, Pan Ocean Energy hereby amends its original Short Form Joinder as follows: For a description of the nature of the injury, please see attachment "A" to this form.

2. **For personal injury claims, describe the injury, as well as how and when it was sustained. Also, Bundle A plaintiffs should identify all health care providers from January 1, 2008 to present, and complete authorizations for release of medical records for each. Bundle B3 plaintiffs should identify all health care providers from April 20, 2010 to present, and complete authorizations for release of medical records for each. Bundle A plaintiffs should also identify all employers from January 1, 2008 to present and complete authorizations for release of employee/personnel records for each employer. Bundle B3 plaintiffs should identify all employers from January 1, 2010, and provide authorizations, if your personal injury took place after April 20, 2010 and you are claiming damages for lost work-time as a result of those personal injuries.[2] [Additional authorizations may be required.]**

3. **For post-explosion claims related to clean-up or removal, include your role or your business's role in the clean-up activities, the name of your employer (if applicable), and where you were working.**

---

[2] All authorization forms should be sent directly to Liskow & Lewis, One Shell Square, 701 Poydras Street, Suite 5000, New Orleans, LA 70139-5099, or served on all counsel using LexisNexis® File & Serve, as provided in Pre-Trial Order No. 12 [Doc. 600]. Any and all documents obtained in connection with these authorizations shall be treated as "Confidential Access Restricted" under the Order Protecting Confidentiality (Pre-Trial Order No. 13), and subject to full copies of same being made available to the Plaintiff (or his attorney if applicable) filing this form and PSC through Plaintiff Liaison Counsel.

Please check the box(es) below that you think apply to you and your claims:

**Non-governmental Economic Loss and Property Damage Claims (Bundle B1)**

☐ 1.   Commercial fisherman, shrimper, crabber, or oysterman, or the owner and operator of a business involving fishing, shrimping, crabbing or oystering.

☐ 2.   Seafood processor, distributor, retail and seafood market, or restaurant owner and operator, or an employee thereof.

☐ 3.   Recreational business owner, operator or worker, including a recreational fishing business, commercial guide service, or charter fishing business who earn their living through the use of the Gulf of Mexico.

☑ 4.   Commercial business, business owner, operator or worker, including commercial divers, offshore oilfield service, repair and supply, real estate agents, and supply companies, or an employee thereof.

☐ 5.   Recreational sport fishermen, recreational diver, beachgoer, or recreational boater.

☐ 6.   Plant and dock worker, including commercial seafood plant worker, longshoreman, or ferry operator.

☐ 7   Owner, lessor, or lessee of real property alleged to be damaged, harmed or impacted, physically or economically, including lessees of oyster beds.

☐ 8.   Hotel owner and operator, vacation rental owner and agent, or all those who earn their living from the tourism industry.

☐ 9.   Bank, financial institution, or retail business that suffered losses as a result of the spill.

☐ 10.   Person who utilizes natural resources for subsistence.

☐ 11.   Other: _____

**Post-Explosion Personal Injury, Medical Monitoring, and Property Damage Related to Clean-Up (Bundle B3)**

☐ 1.   Boat captain or crew involved in the Vessels of Opportunity program.

☐ 2.   Worker involved in decontaminating vessels that came into contact with oil and/or chemical dispersants.

☐ 3.   Vessel captain or crew who was not involved in the Vessels of Opportunity program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities.

☐ 4.   Clean-up worker or beach personnel involved in clean-up activities along shorelines and intercoastal and intertidal zones.

☐ 5.   Resident who lives or works in close proximity to coastal waters.

☐ 6.   Other: _____

Both BP and the Gulf Coast Claims Facility ("GCCF") are hereby authorized to release to the Defendants in MDL 2179 all information and documents submitted by above-named Plaintiff and information regarding the status of any payment on the claim, subject to such information being treated as "Confidential Access Restricted" under the Order Protecting Confidentiality (Pre-Trial Order No. 13), and subject to full copies of same being made available to both the Plaintiff (or his attorney if applicable) filing this form and PSC through Plaintiff Liaison Counsel.


s/ John E. Tomlinson
_____
Claimant or Attorney Signature

John E. Tomlinson
_____
Print Name

04/20/2013
_____
Date

**ATTACHMENT "A"**

**The Economic Impact of the Oil Spill and Injuries to Pan Ocean Energy**

1.      As a direct and foreseeable consequence of the *Deepwater Horizon* disaster, the Secretary of the U.S. Department of Homeland Security declared the *Deepwater Horizon* incident a Spill of National Significance ("SONS") under the authority of the National Oil and Hazardous Substance Pollution Contingency Plan ("NCP") (40 CFR §300.323).  The SONS declaration triggered the National Response Framework and the ensuing multi-jurisdictional response necessarily activated every single Emergency Support Function established by the federal disaster response framework to respond to the Oil Spill.

2.      On April 30, 2010, MMS and the U.S. Coast Guard ("USCG"), as a direct and foreseeable result of the Spill, issued a Joint National Safety Alert to all offshore operators and drilling contractors.  This alert recommended that all operators and contractors: review the condition and operability of well control equipment (both surface and subsea) currently being used to ensure that it is capable of shutting in the well during emergency operations; review all rig drilling/casing/completion practices to ensure that well control contingencies are not compromised at any point while a BOP is installed on the wellhead; review all emergency shutdown and dynamic positioning procedures that interface with emergency well control operations; inspect lifesaving and firefighting equipment for compliance with federal requirements; ensure that all crew members are familiar with emergency/firefighting equipment and that all personnel have been properly trained, drilled and exercised and are capable of performing in an emergency.

3.      Also on April 30, 2010, as a direct and foreseeable result of the Spill, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the Deepwater Horizon explosion and Oil Spill to determine what other precautionary measures

and technologies should be required of the oil and gas industry to improve the safety of industry operations on the OCS.

4.      On May 7, 2010, MMS, as a direct and foreseeable result of the Spill and its environmental devastation, sent suspension letters to operators with active leases notifying them that leases would be suspended (including suspension of lessee payment/royalty requirements) to allow the Department to conduct its 30-day review.

5.       In response to the President's Directive and after reviewing available information about the causes of the Oil Spill, on May 27, 2010, Interior Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* ("Safety Report").

6.      In the Safety Report, the Secretary recommended several immediate prescriptive requirements and a number of longer-term performance-related safety measures to be taken to improve the safety of offshore drilling.  In particular, the Safety Report targets the effectiveness of blowout preventers ("BOP"), and also calls for measures to promote the integrity of wells, to enhance well control, and to foster a culture of safety through operational and personnel management.

7.      Among the measures from the Safety Report to take immediate effect was compliance by all operators with the April Joint Safety Alert within 30 days—converting those recommendations to mandates. These measures were taken as a direct and foreseeable result of the Spill and its environmental devastation.

8.      On May 28, 2010, based on the Safety Report and its recommendations, which were the direct and foreseeable consequences of the Spill and its environmental devastation, the Secretary formally concluded in a Decision Memorandum that "offshore drilling of new

deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."

9.      As a direct and foreseeable result of the Oil Spill and its environmental devastation, the Secretary in the Decision Memorandum, *inter alia*, directed the MMS to suspend certain well drilling activity in the OCS.  On May 30, 2010, MMS made effective a Notice to Lessees and Operators (NTL No. 2010-N04) that imposed a 6-month moratorium ("May Moratorium") on the drilling of deepwater wells in the Gulf of Mexico and Pacific regions of the OCS, in light of significant risks associated with drilling in deepwater absent implementation of the recommendations from the Safety Report on safety equipment, practices, and procedures.

10.     Specifically, NTL No. 2010-N04 directed operators to cease drilling new deepwater wells in the Gulf of Mexico and the Pacific regions of the OCS.  It also prohibited drilling any wellbore sidetracks and bypasses.  Moreover, it halted spudding of any new wells.  It also notified lessees and operators that MMS would not consider any new permits for deepwater wells or related activities for six months.

11.     Consistent with NTL 2010-N04, the MMS, as a direct and foreseeable result of the Spill and its environmental devastation, also issued Suspensions of Operations to lessees and operators pursuant to 30 C.F.R. §250.172. The suspensions affected 33 active deepwater drilling rigs in the Gulf of Mexico.

12.     On the heels of its directive to implement the deepwater moratorium, MMS issued a second Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N05) on June 8, 2010, calling for seven new, increased safety measures for drilling permits on the

OCS.  The recommendations applied to all activities (deepwater and shallow water) on the OCS, including the deepwater drilling activity suspended under NTL No. 2010-N04.  These actions were taken as a direct and foreseeable result of the Spill and its environmental devastation.

13.     On June 18, MMS issued a third Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N06) in direct response to the Oil Spill, BP's abysmal planning for a blowout and worst-case scenario, BP's failure to contain the Oil Spill and limit the Spill's environmental devastation, and BP's incapacity to adequately respond to the Spill.  NTL No. 2010-N06 required all operators to adhere to revised information requirements for exploration, development and oil spill response plans to include worst-case discharge and blowout scenarios.

14.     On June 22, 2010, Judge Feldman of the United States District Court for the Eastern District of Louisiana, in response to a motion brought by a number of oil and gas drilling service industries, preliminarily enjoined the implementation and enforcement of the May Moratorium effectuated by the Department of Interior through MMS' NTL No. 2010-N04.

15.     In accordance with the Court's order, in June 2010 the Department of the Interior notified lessees and operators that the suspension orders they had received were of no legal force and effect and instructed agency personnel that the first moratorium was unenforceable.

16.     On July 12, 2010, the Secretary of the Interior issued a new decision memorandum finding that, as a direct and foreseeable result of the Oil Spill and its environmental devastation, certain drilling operations should be suspended and approvals of pending or future applications of specific drilling types should be frozen until November 30, 2010 ("July Moratorium").

17.     In particular, the Secretary found that, because the available response vessels, personnel and other resources were consumed with the Macondo Spill response, there was a

direct, foreseeable, current, then-existing threat of further environmental devastation produced by exploration and drilling activities in the Gulf of Mexico.

18.     That same day, July 12, 2010, the Department of the Interior issued individual temporary suspension letters to each of the affected operators, implementing the July Moratorium.  The July Moratorium also allowed for the possibility of the July Moratorium being lifted before November 30, 2010.

19.     With certain exceptions, the July Moratorium suspended drilling operations that relied on subsea BOPs or surface BOPs on floating facilities. The July Moratorium had no bearing on production activities; drilling operations that were necessary to conduct emergency activities; drilling operations necessary for completions or workovers; abandonment or intervention operations; or waterflood, gas injection, or disposal wells.

20.     The July Moratorium also instructed MMS to develop and gather information about safety, blowout containment capabilities, and oil spill response capability and provide a report to the Secretary regarding potential conditions for the resumption of drilling by October, 2010.

21.     On October 12, 2010, the U.S. Department of Interior announced that the federal government would lift the July Moratorium. The October announcement indicated an early end to the July Moratorium, which had been scheduled to extend through the month of November 2010.

22.     On October 14, 2010, MMS published an Interim Final Rule (75 Fed. Reg. 63346), "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The Interim Final Rule addressed certain recommendations from the Secretary to the President in the Safety Measures Report. The Interim Final Rule set forth new basic requirements for

containment resources in its interim drilling safety rule, which incorporated many of the previously issued requirements contained in NTLs issued during the aftermath of the *Deepwater Horizon* explosion and the protracted Oil Spill response.

23.    In direct and foreseeable response to the Oil Spill and its environmental devastation, on November 8, 2010, Interior issued another Notice to Lessees and Operators, specifically requiring operators engaging in activities using subsea BOPs or surface BOPs on floating facilities to provide the Department with adequate documentation demonstrating that they have access to and can deploy resources to respond to another blow out or loss of well control, such as the kind experienced in the Oil Spill.

24.    On January 3, 2011, MMS notified 13 oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

25.    The economic impacts of the Oil Spill and its environmental devastation affected individuals and businesses, including Pan Ocean Energy, in various industries across the Gulf Coast OCS and the Pacific OCS.

26.    The Oil Spill and the foreseeable governmental response to a disaster of this magnitude, including the Moratoria imposed in direct response to the Oil Spill's devastation of the coastal and marine environments, have caused and will continue to cause a loss of revenue for individuals and entities, including Pan Ocean Energy, that rely on the use of the Outer Continental Shelf and its resources in connection with offshore deepwater drilling activities.

27.    As a result of the Oil spill, oil related service companies, including Pan Ocean Energy, have suffered loss of income and the ability to generate future income. Businesses were forced to down size and lay off employees, and the resulting unemployed work force was forced to either relocate or find employment outside the industry.   The eventual lifting of the

moratorium did not undo the shift and displacement of the work force in the Gulf offshore oil and gas industry, and a realignment of labor and rehiring of workers could not happen immediately upon the lifting of the moratorium. Consequently, the rebuilding of the industry work force has been difficult and slower than expected.

28.     In summary, companies such as Pan Ocean Energy that provide support products and services related to deepwater oil and gas exploration and drilling activities have suffered and continue to suffer economic impact as a result of the BP Deepwater Horizon oil spill.

29.     Pan Ocean Energy is an oil rig service and supply business started in 2002 that provides heavy metal fabricating and welding services to the deepwater drilling industry. Pan Ocean Energy provides services such as fabrication, blasting and painting, assembly of equipment, as well commissioning and start-up. Pan Ocean Energy's services include: ASME coded pressure vessel fabrication; Storage vessel fabrication; Process and Pressure; Pipe spool fabrication; Structural fabrication; and Blasting and Painting. Offshore rig operators are the primary customer of Pan Ocean Energy's operations in the Gulf of Mexico ("Gulf"), accounting for the majority of Pan Ocean Energy's total business by volume.

30.     Due to the Oil Spill, Pan Ocean Energy's customers were virtually eliminated and its sales in the Gulf were drastically reduced. Due to the Oil Spill, Pan Ocean Energy's customers shut down their existing projects and moved their rigs overseas. As a result, Pan Ocean Energy was not able to generate new sales and existing customers did not issue new purchase orders nor did they initiate new contracts. Having down sized, cut back operations and laid off employees and other personnel as a result of the Oil Spill and moratorium, it has been and will be difficult for Pan Ocean Energy to grow sales and regain markets and/or market share.

31.     As a direct and foreseeable result of the Oil Spill and Defendants' acts and

omissions, Pan Ocean Energy's business has suffered and will continue to suffer direct and substantial financial losses, including the loss of profits and impairment of earning capacity. Pan Ocean Energy's overall business value and ability to generate income has diminished.

32.     As a direct and foreseeable result of the Oil Spill, and the Defendants' acts and omissions, Pan Ocean Energy incurred expenses assessing damages resulting from the Spill.

33.     As a direct and foreseeable result of the Oil Spill, and the Defendants' acts and omissions, the Pan Ocean Energy was forced to hire the undersigned counsel and the undersigned law firm and as incurred attorneys' fees and costs.

34.     The types of damages contained herein are by no means exhaustive. There are many other forms of harm or damage from the Oil Spill that may be unknown and Pan Ocean Energy reserves the right to amend this Complaint as additional information becomes available.

## **"Presentment" Under OPA**

35.     To the extent required by law, and/or by consent and/or stipulation by BP, Pan Ocean Energy has satisfied all of the requirements of 33 U.S.C. §§ 2713(a) and (b) by the submission of their claims to the BP OPA Claims Program and/or the Gulf Coast Claims Facility.

36.     In particular, on January 16, 2013, Pan Ocean Energy submitted a "BP Claims Program-Claim Form for Individuals and Businesses" and a "Notice of Claim", including a "sum certain" and a description of the incident and claim as well as supporting documentation to BP as the "responsible party" under OPA via U.S. Mail overnight express and e-mail to the addresses provided by the BP Claims Program.

37.     BP failed to settle the Claim by payment within 90 days of presentment.

38.      Because Pan Ocean Energy previously asserted claims against the responsible

party through its prior Gulf Coast Claims Facility claim on January 10, 2011 (GCCF Claimant ID # 3481802),  which was denied on July 26, 2011,  the presentment on or about January 16, 2013, was made (and/or re-made) out of an abundance of caution.

39.     Transocean has neither advertised nor established an OPA claims process.


**Plaintiff Demands Trial by Jury**