UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | *2:13-cv-02948-CJB-SS*<br><br>MDL NO. 2179 |
| **This document Relates to:**<br>2:13-cv-02948, Southbrook Gulf Shores, LLC, et al v. BP Exploration And Production, Inc, et al and *Cv 2:10-8888; (short form joinder Rec. Doc. 70315)* | SECTION J<br><br>JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**FIRST AMENDED COMPLAINT FOR DAMAGES
AS AMENDED SHORT FORM JOINDER
AND PRESENTMENT PURSUANT TO
PRE-TRIAL ORDER NO 33**

Plaintiff, SOUTHBROOK GULF SHORES, LLC, et al. avers and represents as follows:

## PROCEDURAL BACKGROUND

1.      This complaint and presentment was initiated by a short form joinder filed as document number 70315 in Civil Action No. 10-8888 filed on or about Aril 20, 2011 pursuant to Pretrial Order No. 33 document 1549 filed March 9, 2011.

2.      Subsequently, under the Representation of other counsel, Southbrook Gulf Shores, LLC filed a Complaint for Damages in United States District Court for the Northern District of Florida under Civil Action No. 3:13-cv-00171-RS-EMT, which was transferred to the

1

Eastern District of LA was consolidated with MDL 2179 and is currently pending in Civil Action No. 2:13-cv-02948-CJB-SS and with the Cases consolidated in MDL 2179.

3. The court orders, not subject to any objection or appeal by the defendants, allowed the addition of parties to the complaint by the submission of short form joinders. In order to accommodate the court and the parties, the filing of a short form joinder in this case was sufficient as presentment. Longer presentments were prepared by prior counsel including the presentment attached identifying some of the other parties and the claims set out in more detail. Short form joinders in this case (at least) name the individual plaintiff identified below and include particularly Southbrook Gulf Shores. LLC. To more clearly define the related parties who have the rights to the various developer claims, counsel amends this complaint to properly identify parties who were part of the family of corporations represented by Southbrook and the individual plaintiff.

4. Plaintiff, SOUTHBROOK GULF SHORES, LLC, is an entity that/who is domiciled in the State of Alabama with its principle place of business/operations in the State of Alabama.

5. Plaintiff, MICHAEL ANTHONY MABUGAT (hereinafter "Mabugat"), is a person of full age and majority who is a resident and domiciliary of Chatsworth, California. Michael Mabugat is the principal and interest holder, either in individual capacity or through his ownership of the other plaintiff entities, over the Delfino Development Project, to which the damages set forth herein relate.

6. Plaintiff, PRAETORIAN DEVELOPMENT OF DELAWARE LLC, is a Limited Liability Company, who is domiciled in the State of California, authorized to do and doing business in the state of Alabama at all material times;

7. Plaintiff, WESTLAKE DEVELOPMENT OF ALABAMA, LLC, is a Limited Liability Company, who is domiciled in the State of Alabama, authorized to do and doing business in the state of Alabama at all material times; Westlake Development of Alabama, LLC formally operated under the legal name of Southbrook Development of Alabama, LLC, from its formation until 2005, when the legal name was change to Westlake Development of Alabama, LLC.

8. Plaintiff, PRAETORIAN DEVELOPMENT AND ACQUISITIONS, LLC, is a Limited Liability Company, who is domiciled in the State of California.

## GENERAL ALLEGATIONS

9. Plaintiffs have suffered damage and injuries to financial and personal interests, diminution in value of assets, damage to the economic livelihood, lost profits and/or impairment in earning capacity, and damage to property and/or diminution in value as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico beginning on April 20, 2010. Plaintiff was directly and indirectly involved in causes of action which are the subject of the litigation where this suit was previously filed, which were eliminated and/or adversely and detrimentally affected on April 20, 2010, thereafter and to present, when the Deepwater Horizon exploded, burned and subsequently sank in the Gulf of Mexico.

10. Plaintiffs adopt and incorporate as if fully restated herein the factual allegations, causes of action, and prayer for relief, raised in the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *Jn re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "MDL Complaint").

11. Plaintiffs were each excluded from the Deepwater Horizon Economic and Property Damages Settlement Agreement, approved by Judge Carl Barbier of United States District Court for the Eastern District of Louisiana. In re: *Oil Spill by the Oil Rig "Deepwater horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179*. Plaintiff's complaint against Defendants is as follows:

## NATURE OF THE CLAIM

1. The purpose of the Short Form Joinder was to minimize the amount of redundancy in pleading and to simplify the filing of claims and filing redundant allegations so the facts are not pled in detail, but a short summary of what is adopted herein is considered appropriate.

2. On or about April 20, 2010, the *Deepwater Horizon* drilling platform exploded and sank, causing oil to gush for 87 days before the well was capped, with over 200 hundred million gallons of crude oil being pumped into the Gulf. BP was found to have lied about the amount of oil that flowed from the well (Page 32 of Document 14021). Oil from the Macondo Well, MC-252, is still present in the waters of the Gulf and its surrounding waterways and continues to wash up onto the shores of these waterways, resulting in the worst maritime environmental disaster in United States' history. The deleterious and injurious effects caused by the disaster are continuing and are evidenced by the continued presence of oil, the necessary dispersants and the resulting eco-systemic damage and pollution. These effects continue to damage and plague the Gulf in general and the surrounding coastal shorelines in particular.

3. While the amount is impossible to determine, the court found that 4 million barrels of oil spilled into the Gulf of Mexico and after recovery the net amount in the Gulf was 3.19 million barrel (Page 44 of document 14021).

4.      Plaintiffs have suffered damage and injuries including, damage to the economic livelihood, property damage, diminution in value, lost profits and/or impairment in earning capacity as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico beginning on April 20, 2010.

## THE PARTIES, JURISDICTION AND VENUE

5.      The Parties, Jurisdiction and Venue are adequately covered in the case in chief and to avoid redundancy, only a few specific facts are alleged.  The pleadings setting out the facts, briefs of the plaintiffs in the case in chief, the facts developed and presented and the findings of the court on liability and otherwise are incorporated herein by reference.

## FACTUAL BACKGROUND

6.      Plaintiffs adopt and incorporate as if fully restated herein the factual allegations, causes of action, and prayer for relief, raised in the Amended B1 Master Complaint for private economic losses, Document No. 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "MDL Complaint"). Plaintiffs further adopt and incorporate as if restated herein all factual allegations information contained in the master complaints filed by the PSC. Plaintiffs further adopt and incorporate as if restated herein all factual allegations information contained in the the Claims made to the BP Claims Program, attached hereto as EXHIBIT "A." Plaintiffs further adopt and incorporate as if restated herein all factual allegations information contained in the GCCF Claims, presentments and other exhibits attached hereto as EXHIBIT "B." Plaintiffs further adopt and incorporates as if fully restated herein the Short Form Joinder filed as document number 70315 in Civil Action No. 10-8888, a copy of which is attached hereto as EXHIBIT "C." Plaintiffs further adopt and incorporate as if fully restated herein Supplemental and Amended Responses to Phase One

Written Discovery Requests, dated October 8, 2011; Amended Response to Phase One Request for Admission No. 76, dated December 27, 2011; and Supplemental and Amended Responses to Phase One Interrogatories Nos. 6, 7, and 17, dated December 14, 2012 in the MDL.

7. On or about September 4, 2014 the findings of fact were entered in the Phase One Trial. In that case, the court found, inter alia,

> BP (meaning BPXP and BP America Production Company, but not BP p.l.c.), Transocean (meaning Transocean Holdings LLC, Transocean Deepwater Inc., and Transocean Offshore Deepwater Drilling Inc., but not Transocean Ltd. or Triton Asset Leasing GmbH) and Halliburton (meaning Halliburton Energy Service, Inc. and Halliburton's Sperry division) are each liable under general maritime law for the blowout, explosion, and oil spill. BP's conduct was reckless. Transocean's conduct was negligent. Halliburton's conduct was negligent. Fault is apportioned as follows:
>
> "BP: 67%
>
> "Transocean: 30%
>
> "Halliburton: 3%[1]

8. To the extent supported on appeal, the plaintiff adopts the findings of fact and conclusion of law set forth in that case 2:10-md-02179-CJB-SS (Rec. Doc. 13355). This order supplements findings on or about April 28, 2010 that BP Exploration and Product, Inc. was deemed the responsible party under OPA 33 USC §2714.

9. BP defendants were found to be reckless. Given the potential damage possible and actually suffered as well as the other facts developed in trial, Plaintiffs allege that to the

---

[1] Rec. Doc. 13381, 21 F. Supp. 3d 657 (E.D. La. 2014)

extent the findings in the underlying case supports the finding that all the defendants were guilty of wantonness.

10. Plaintiffs incorporate by reference all of the documentation concerning causation, liability or otherwise developed in the underlying case: IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA *In re: Oil Spill by the Oil Rig "Deepwater horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, Plaintiffs, v. BP Exploration & Production Inc.; BP America Production Company; BP plc Defendants. Civil Action No. 12-970 and the other pending consolidated complaints and the evidence developed under those and orders subject to appeals and the findings in those appeals.

11. The factual allegations of damage, injury and harm suffered by Plaintiffs as a result of the Spill are more specifically set in the short form joinder, which is incorporated by reference herein and summarized below.

12. Plaintiffs, Michael Mabugat, Southbrook Gulf Shores, LLC, Westlake Development of Alabama, LLC, Praetorian Development of Delaware, LLC, Praetorian Development and Acquisitions, LLC, are all related parties involved in the Delfino Development Project, which are the subject of the developer claims involved herein. While the details of the developer claims have previously been provided, we are providing the following summary to more clearly define the related parties who have the rights to the various developer claims.

13. In August 2005, Westlake Development of Alabama, LLC (an Alabama company) closed escrow for a 26.56-acre property fronting the Intercostal Waterway in Gulf Shores, Alabama. The property at the time was a vacant, unimproved tract of land zoned for Intracoastal Waterway East uses that emphasize a maritime theme. The purchase transaction

involved buying 100% membership shares in the entity named Southbrook Development of Alabama, LLC (an Alabama company) that bought and owned the property. The membership shares for Westlake Development of Alabama, LLC are owned 100% by the entity named Praetorian Development of Delaware, LLC (a Delaware company). Michael Mabugat owns 100% of the membership shares for Praetorian Development of Delaware. Plans were to construct 724 condominium units, approximately 35,000 sf. of retail space, a 50-boat marina and various site amenities on the property (hereinafter referred to as "Delfino Resorts").

14. Later that month, in August 2005, an entity named Southbrook Gulf Shores, LLC purchased two contiguous beachfront parcels of land in Gulf Shores, Alabama. These two lots of land were located approximately 16 miles from Delfino Resorts. The mortgage loan for the two beachfront lots was personally guaranteed by Michael Mabugat. As a result of the purchase transaction, 100% of the membership shares for Southbrook Gulf Shores, LLC were transferred to an entity named Community Capital Group, LLC, an entity owned 100% by Rick Harris. In October 2007, however, Community Capital Group, LLC assigned 100% of its membership interest to Michael Mabugat. As such, Michael Mabugat currently owns 100% interest in Southbrook Gulf Shores LLC. Plans were to construct one multi-family duplex (4 units) on each beachfront lot, approximately 7,280 square feet total or 3,640 square feet per side ("hereinafter referred to as "Delfino Duplexes"). The Delfino Duplexes were intended to be rented out to special guests or marina visitors as one of the many off-site amenities offered by Delfino Resorts.

15. In late 2005, Praetorian Development and Acquisitions, LLC (a California company), an entity owned 100% by Michael Mabugat, began developing Delfino Resorts on behalf of Westlake Development of Alabama, LLC. It hired Hatch, Mott & McDonald, a

8

planning and engineering company based in Mobile, Alabama, to complete the revisions to the tentative Planned Unit Development (PUD) and to obtain approval from the City of Gulf Shores ("the City") for the final entitlement. Again, the PUD consisted of the building of 724 condominium units, approximately 35,000 sf. of retail space, a 50-boat marina and various site amenities. On behalf of Westlake Development of Alabama, LLC, Praetorian Development and Acquisitions, LLC began the market analysis, initial finalization of the entitlement, and selection of the sales team, engineering and architectural team.

16. In 2006, initial advertising via magazines and other media, including a project website, began in an effort to increase awareness of the Delfino Resorts project. By the end of 2006, the Final PUD was approved by the City to increase the density of the project and to build a Marina facility and commercial units. Wetland Analysis and an Environmental Impact Study (EIS) were also submitted and approved by the City.

17. In 2007, the Bayside Realty Sales team began marketing the first phase of the project – the "Acqua Building" – which was to consist of 153 condo units and retail space on the ground floor. The project architect, Horizons Design, worked on completing the design of the Acqua Building for preliminary approval by the City. Bayside Realty's sales team, headed by Rick Harris, began accepting sales reservations for the Acqua Building. Unit reservations required a $5,000 deposit, which were deposited into escrow. 155 reservation agreements and/or intent to sign forms were signed and deposited to the escrow company by Bayside Realty. By this time, construction design for the Acqua Building was 80% completed. Structural, electrical, mechanical and landscaping designs were also submitted to the City for initial approval.

18. In 2008, Praetorian began drafting the Condo docs for the Phase 1 Acqua Building as well as the Purchase and Sale Agreement contracts needed to convert the

reservations to a sales contract. Later that year, Praetorian selected a contractor to be the builder and general contractor for the Acqua Building and the City approved the construction documents and the construction of the Phase I Acqua Building. Commercial Bancorp subsequently underwrote the Acqua Building for the construction loan, with Marshall Bank being the preferred construction lender. As a condition of the Marshall Bank loan, 75% of the Acqua Building, or 115 units, had to be in escrow before construction could begin. Praetorian received a Marshall Bank construction loan commitment with a short-term perm loan for Delfino Resort's Phase I 153-unit Acqua building from Commercial Bancorp.

19. In early 2009, only 15% of the existing sales reservations agreed to sign the Purchase and Sales Agreement. As such, in order to meet the 75% pre-sale condition of the Marshall Bank construction loan, Coldwell Bankers began a nationwide marketing campaign to sell the Acqua Building. By year-end, Coldwell Bankers was able to successfully secure 125 reservations.

20. In early 2010, the US Army Corps of Engineers issued the USACE Section 10 permit for the Delfino Resorts' Marina project, which essentially permitted further development of the Marina and commercial parcel of the property. This permit made Delfino Resorts one of only a handful of projects to be allowed to build and maintain a fuel depot inside the Marina. By Second Quarter of 2010, 42 of the 125 total reservations agreed to sign a Purchase and Sales Agreement. Later this year, however, Coldwell Bankers verbally informed Praetorian that they were having a hard time selling the remaining 83 pre-sold units to get the construction moving due to the economic aftermath of the oil spill. Commercial Bancorp also advised Praetorian that it was having a hard time underwriting the construction loan. Given these economic conditions, Coldwell Bankers and the escrow company ultimately decided to return the $5,000 reservation

deposits to the buyers from late 2008 and early 2010, and Marshall Bank withdrew their bank construction loan commitment.

21. This amendment to the complaints and short form joinders is meant to clarify previously asserted claims against the responsible parties through the presentment and short form joinder referenced above, this ancillary proceeding is filed out of abundance of caution and to supplement and not replace other actions pending. BP either denied the claims or otherwise failed to satisfy within 90 days of presentment. It is noted that neither BP nor any of the other defendants have requested any additional information related to the short form joinder. While sufficient findings are a matter of record in the Orders previously referenced, a partial summary follows.

22. The chemical dispersants used by Defendants to accelerate the dispersal of the oil has significant side-effects. Corexit EC9500A and Corexit EC9527A were the principal dispersants used. These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill. In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level." Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to bio-accumulate in the tissues of fish or other organisms. Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261." Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil

spills in the United Kingdom. Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

23. More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August. Dispersant use continued well after the Spill at the wellhead was stopped. The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface. Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil. The resulting mixture remains present in the Gulf of Mexico.

24. Pollution from the well has been made a fixture of the gulf environment with no foreseeable date when it will end.

25. In addition to the events that led up to the oil spill and the treatment of the oil spill offshore, the defendants engaged in conduct which was not directly related to the spill but which ultimately caused much of the damage suffered by the Plaintiffs. This conduct included, inter-alia, misrepresenting in print and media the extent of the spill, misrepresenting what BP was doing to help after the spill; misrepresenting what the spill entailed, the damage done, the residual effects and other things which Plaintiffs relied upon in the its business decisions and which harmed it in the following respects: 1) the continued operations and expenditures which it otherwise could have cut to save expense, 2) the economy was and is adversely affected by the uncertainty caused as these misrepresentations were disclosed and as they continue to be discovered.

26. Oil, dispersants, and other pollutants released by Defendants remain in Gulf waters, the Gulf floor, Alabama waters, and land owned and/or within the state of Alabama, and

continue to cause damage.  Oil, dispersants, and other pollutants have settled into the sediment on the Gulf floor and the bed underlying waters of Alabama, where it has killed, is killing, and will continue to kill marine life and has caused increased growth rates of dangerous bacteria and will continually discharge into, and cause damage to, the water, land, property, and resources.

### For Each Claim

27.	We incorporate by reference all of the evidence and documentation and legal theories concerning damages, causation, liability or otherwise developed in the underlying case: IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA *In re: Oil Spill by the Oil Rig "Deepwater horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179, Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated Plaintiffs, v. BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., Defendants. Civil Action No. 12-970.

28.	This analysis is not considered exhaustive but is used in order to complete presentment and suit.  Other methods of analyzing the information provided using generally accepted accounting principles would apply to this analysis and this is only exemplary.

### CLAIMS FOR RELIEF

1.	Plaintiffs adopt and incorporate as if restated herein, all claims for relief raised in the MDL Complaints, presentments and the Short Form Joinders set forth above against the Defendants as responsible parties under the Oil Pollution Act, 33 USC §2701, et seq., which holds responsible parties liable to plaintiffs for removal costs and damages arising directly or indirectly out of the following:

    a.	Loss of Natural Resources;

    b.	Loss or Damage to Real or Personal Property,

      c.      Subsistence Use,

      d.      Loss of Revenue;

      e.      Loss of Profits and/or Earning Capacity,

      f.      Loss of Costs for Increased Public Services and other losses.

2.      Plaintiffs adopt and incorporate as if restated herein, all claims for relief raised in the MDL Complaints, presentments, and the Short Form Joinder No.(s) listed above, against all defendants identifying General Maritime Law causes of action and claims for relief relating to negligence, gross negligence and willful, and wanton misconduct. Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints, presentments and the Short Form Joinder listed above, against all defendants for Punitive Damages arising out of the willful and wanton misconduct and/or gross negligence as alleged and described in the MDL Complaints.

3.      Damages: $141.5 million dollars.

The damages include Total Hard Costs Spent/Lost: of $6,064,348.43 which does not include the acquisition of the property.

The damages further include the lost profits

Phase I Pro Forma by Commercial Bancorp (3 documents include Financial Projection, Major Assumptions and Pricing Grid): This pro-forma was for the Phase I Acqua Building (153 units) only. This shows a net revenue of around $51M.  Pro-Forma for All 3 Phases (Created by Michael in 2005): This is the pro-forma for the ENTIRE project — all phases.  A summary of the pro-forma is below:

 TOTAL REVENUE (COMPLETE DEVELOPMENT): $573M

     NET REVENUE (Less Commissions) :     $550M

TOTAL COST (Hard and Soft Cost):     $409M

NET REVENUE (Complete Development 8-year cycle): $141.5M

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests judgment against Defendants, jointly, severally, and in *solido*, as follows:

a. Declaratory and injunctive relief;

b. Economic and compensatory damages in amounts to be determined at trial;

c. Punitive damages;

d. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

e. Attorneys' fees and costs of litigation; and,

f. Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

REQUEST FOR TRIAL BY JURY

Date:  November 24, 2015

                                                   Respectfully Submitted,

                                                   /s/Mary Beth Mantiply_____
                                                 MARY BETH MANTIPLY
                                                 Fed. Bar No. MANTM7470
                                                 P.O. Box 862
                                                 Montrose, AL 36559
                                                 251.625.4040
                                                 Adele123m@aol.com
                                                 Plaintiff's Counsel

<u>Of Counsel</u>

NEIL C. JOHNSTON, Jr.
ASB-2968-X98K | JOHNN0326
LAW OFFICE OF NEIL C. JOHNSTON JR., LLC
150 Berwyn Drive West
Mobile, AL 36608
Telephone: (251) 709-8251

Facsimile: (251) 725-9732
NeilCJohnston@ncjlawoffice.com

GREGORY M. FRIEDLANDER
Gregory Friedlander
01886 Bar Number
Attorney for Plaintiff
Gregory M. Friedlander &
Associates, P.C.
11 S. Florida St.
Mobile, AL 36606-1934
(251)470-0303
(888)441-2123
E-Mail Address: Isee3@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th Day of November, 2015, I electronically filed the foregoing with the Clerk of court by using the CM/ECF system via the CM/ECF System, and provided notice by and through LexisNexis to all counsel of record.

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:   (None).

/s/Mary Beth Mantiply